### LESLIE S. FIELDS V. STATE OF NEBRASKA.

#### FILED NOVEMBER 17, 1921.  No. 21867.

1. **Criminal Law:** ABORTION: ADMISSIBILITY OF LETTER. In a prosecution for committing an abortion upon a woman who subsequently died as a result of the operation, it is not error to receive in evidence a letter, written by decedent to a coconspirator the day before the operation, and six days before her death, which contains statements that evidence a conspiracy between herself and the addressee and the defendant, the statements in the letter being competent and relevant to the facts connected with the commission of the offense and being clearly a part of the *res gestae*, nor is it error to permit the jury to take such letter when it retires to deliberate upon its verdict.

2. ———: JURY: RIGHT TO EXHIBITS. "The modern practice, both in civil and criminal cases, is to send to the jury room all instruments, articles and documents, other than depositions, which have been received in evidence, and which will, in the opinion of the trial judge, aid the jury in their deliberations." *Russell v. State*, 66 Neb. 497.

3. ———: ———: ———: DISCRETION OF COURT. "In the absence of statutory direction it is, in a great measure, left to the sound discretion of the court as to what papers, books or other matters of evidence, or instructions, the jury will be permitted to carry with them to their room upon retiring to consider of their verdict." *Langworthy v. Connelly*, 14 Neb. 340.

4. ———: CONSPIRACY. "When a conspiracy is once shown to exist by the requisite *quantum* of proof, the acts and declarations of each of the conspirators, in furtherance of the common design, are the acts and declarations of all." *Lamb v. State*, 69 Neb. 212.

5. **Abortion:** AFFIRMANCE. The record examined, and *held* that the verdict is supported by the evidence; and *held* that the court did not err in denying an application for a new trial.

ERROR to the district court for Douglas county: ALEXANDER C. TROUP, JUDGE. *Affirmed.*

*Matthew Gering, B. N. Robertson, A. L. Sutton* and *A. S. Ritchie,* for plaintiff in error.

*Clarence A. Davis, Attorney General,* and *Mason Wheeler, contra.*

Heard before MORRISSEY, C.J., LETTON, ROSE, DEAN, ALDRICH, DAY and FLANSBURG, JJ.

DEAN, J.

Leslie S. Fields, a practicing physician, was informed against jointly with Mrs. Minnie Deyo and charged with having produced an abortion upon the person of Ruth Ayer, an unmarried woman. The information charges that the offense was committed August 3, 1920, and that Miss Ayer died August 8, 1920, as a result of the operation. Defendant was granted a separate trial, and was convicted and sentenced to serve an indeterminate term of not less than one nor more than ten years in the penitentiary. From the sentence so imposed he prosecutes error.

On the part of the state Dr. Strickland testified that in the evening of August 3, 1920, he administered an anæsthetic at the home of Mrs. Deyo to Ruth Ayer at defendant's request, and that the only persons present besides himself were Dr. Fields, the patient, and Mrs. Deyo. He said that Fields then "proceeded to do a curettement" with the same instruments that are used in performing an abortion. He stated that so far as he could observe the patient was normal at the time of the operation, and that he saw no blood until after it was performed. August 5, at about 6 in the evening, Dr. Fields again operated on Ruth Ayer at the Deyo home, and he again, at his request, administered an anæsthetic with the same persons present as before. On the day that the inquest was held over the remains of decedent, Strickland said he had a conversation with Fields, and that Fields told him he would like to have him "forget about the Tuesday operation and testify about Thursday only." Just before he testified at the coroner's inquest, in answer to an inquiry, he told Fields that he "didn't think he had a leg to stand on," to which Fields replied: " 'What are you going to say?' I says, 'I won't say any more than what I really have to.' I don't remember whether he asked me about

the Tuesday operation then or not, but he evidently understood that, because he says, 'My God, don't do it.' "

The offices of defendant and of Dr. Nettie Gerish are located in the same building and on the same floor. She testified that Miss Ayer came to her office Tuesday, August 3, a few minutes before the noon hour, and, upon examination, she discovered pregnancy that was about four months advanced, but that she was in all respects normal and in no need of an abortion.

Watson Alexander, aged 19, was employed in a Hayes Center store. Miss Ayer was the assistant postmistress in the same town. They were engaged to be married. Watson admitted that he caused her unfortunate condition. He was informed against as having been implicated in the alleged crime, but he waived his privilege and testified. He said they were acquainted about four years and discovered that she was pregnant in May, 1920. In July they came to Omaha together to have an abortion performed. They called on a doctor in the Bee building, whose name he did not recall, who refused to perform the operation and advised them to marry, but subsequently the doctor said "there was somebody in the building that had done such things," and his office was in room 410 or 412. It seems that they then returned to their respective homes, at Hayes Center, with the intention on Watson's part that they would marry, but Ruth for financial and other reasons refused. Soon thereafter it was arranged that Ruth should go to Omaha alone to have the operation performed, and on August 2, 1920, he gave her $110 and took her to McCook, where she took the train for Omaha about 10 that night. Subsequently he sent $70 to her at Omaha. He identified a letter addressed to him at Hayes Center, and also the envelope, both being in Ruth Ayer's handwriting. He said he received the letter at Hayes Center August 5, about 3 in the afternoon. The letter, dated August 3, 1920, was received in evidence over defendant's objection and was read to the jury. The envelope bears this postmark, "Aug

3 7 P M 1920 Nebr." The letter and the envelope will be presently noted more in detail. The witness said he did not remember seeing Dr. Fields in July. A page from the register of the Wellington Inn and a room card purport to show that Ruth Ayer of Hayes Center, Nebraska, arrived at the hotel as a guest August 3, and that she left the same day.

Defendant testified that in the latter part of June or early in July, 1920, a young man and a young woman, who said they were engaged to be married, came to his office and told him that they feared she was pregnant; that upon examination he discovered pregnancy, and they then expressed a desire "to be rid of the oncoming offspring;" that he told them to marry; that they were not in his office to exceed 20 minutes, and left without making an appointment for a further examination or for any purpose; that he did not learn their names nor make a charge for the examination; that when Miss Ayer came to his office in August, 1920, he did not recognize her as having called on him in July, but that subsequently, at about the time of the operation, there was something about her appearance that caused him to believe her to be the same person. He denied that he was at Mrs. Deyo's house, as testified by Dr. Strickland, on the night of Tuesday, August 3, but said he was there the evening of August 5 and performed a curettement upon decedent. He said that Miss Ayer came to his office August 4, late in the afternoon, and that, upon examination, he discovered an incomplete abortion, a condition for which the authorities "advise a curettement." From his office he took her in his car to Minnie Deyo's house at 2704 North Sixty-fourth street, and on the evening of the next day, namely August 5, he said he performed the curettement operation upon deceased, and that Dr. Strickland administered the anæsthetic pursuant to appointment, that she did not readily yield to the anæsthetic and he attributed this difficulty to the loss of blood before she came to his office. Defendant denied having performed the operation

August 3, and denied that, in the operation performed Thursday, August 5, he used an instrument for dilation, as Dr. Strickland testified, because, as he said, dilation was not necessary. He denied too that he told Strickland to forget the operation of August 3 and to confine his testimony to the event of August 5. It may be added that he denied all of the state's material evidence. Defendant introduced testimony with respect to his whereabouts on the evening of August 3, 1920, which, if true, would have established an alibi that would have been an impregnable shield of defense. It is evident that the jury did not accept the statements of the witnesses with respect to the alleged alibi.

The objection to the introduction of Ruth Ayer's letter is the feature of the case that defendant's counsel stress the most. They contend that but for the letter it is doubtful :: their client would have been convicted. They complain that not only was the letter read to the jury, but the court permitted it to be taken to the jury room as an exhibit while the jury were deliberating upon the verdict. A copy of the letter, written on a letter sheet of the Wellington Inn, follows:

"Fireproofed with Automatic Sprinklers .

"On Direct Car Lines from All Stations

"The New Wellington Inn          Restful Rooms

"Reasonable Rates

"Farnam at Eighteenth   Omaha   F. J. Ramey, Manager

"Aug. 3, 1920.

"My dearest Watson: Oh if you were only here with me Kid I went to that fellow 'Dr. Fields' 412 instead of 410 and waited and waited he didn't come. So there was a lady doctor on same floor so I went to her. Kid she said it was at least 4 or 5 months along and there absolutely could be nothing done, and she said get married etc. I started down stairs kid I just thot I'd wire you and then we'd just get married. But I finally mustered up coureage and went to try this 'Dr. Fields.' He just kinda examined and said it wouldn't be much danger and

could be done. Kid it will take about a week and kid first he said three hundred. That was awful but I told him we would pay it but we just couldn't pay all at once. Then he didn't know whether to do it or not. But finally said. He'd come down to two hundred if we could pay it. So listen dear I paid $150 down. *Now Watson get* at least the $50 and send at once. And listen Watson I haven't any left you see so if you could borrow oh say $75. That would be $25 for me. We'll make it all right if we both just work. Kid its terrible but its a way out. Oh Watson dear if you were just here with me. Kid I'm *afraid.* He's going to take me out to a nurses home he called it, and do it in the morning. I'm so scared Kid what if it would be an awful 'I mean bad place', and I couldn't get away. I'm up in a room and oh I just imagine every thing. Kid listen may-be I won't be able to write this week but I will if I'm possibly able. But then after this week if you don't hear from me, Kid you'll *find* me won't you ? ? ?   I just had to write but may-be they won't notice in the P. O. and then don't mail my letter thru the P. O. Hand it to the mail man if you get the chance. Kid send the $50 if you can't send another *cent.* Get it out of store or any place. I don't know how to tell you to send it. Just the way you think best. I can't write mama or any one else yet so if any thing comes up, I'm in Omaha is all I know to tell them and fix up something else. I'm working or something *you know.* Don't let any one see my address cause they might know. I told my right name and from H. C. Kid this Dr. doctored old man Lugar. Well dearest I'm going thru it all and then we can be happy and have our *whole* lives to pay it. Your own 'goin' to be brave girl Ruth. Send letter and money to *me* 2704 N*th* 64*th* St. Omaha Nebr. Oh I do *love* you Watson and am not going to be *scared.* Don't let Elsie know you heard from me if you can help it. Oh yes see if there is any mail there for me and *you get it* and send it to that address. With all my love Ruth."

This inscription is on the envelope: "Aug 3 7 P M 1920

Nebr (two two-cent stamps canceled) Watson Alexander, Hayes Center, Nebr."

In connection with the letter exhibit it may here be observed that defendant on the cross-examination testified: "Q. Do you know where she (Ruth Ayer) got the information when she wrote on August 3d, she was going to be taken to 2704 North 64th street? A. I do not. * * * Q. When she came to your office on August 4th, did she tell you she knew anything about Mrs. Deyo? A. She did not. Q. And you knew at that time she didn't know it, didn't you? A. Yes, sir." Doubtless the jury concluded that Ruth Ayer's statement in the letter under date of August 3, respecting Mrs. Deyo's address, together with the postmark of that date, outweighed the spoken word of defendant.

Counsel argue that the letter is incompetent. They say it does not show a conspiracy and that it is not a part of the *res gestae*. It is further argued that, even if error was not committed in permitting it to be read to the jury, it was prejudicially erroneous to permit the jury to take it to the jury room as an exhibit. They contend that the letter is in the nature of a dying declaration or a deposition. It does not appear, however, that the court especially emphasized the letter exhibit as evidence. It was not handed to the jury by the court with the instructions, when the case was first submitted after argument, nor until after it had deliberated about 22 hours, when the jury's express request that it be permitted to take it to the jury room was granted.

From a strictly legal viewpoint the letter lacks the solemnity of a deposition and it lacks much of being a dying declaration. A considerable portion of it is devoted to expressions of solicitude lest she and her lover should be unable to meet defendant's demand for more money. But in the buoyancy of youth she said: "We'll make it all right if we both just work. Kid its terrible but its a way out." The letter briefly refers to the ordeal that was just before her, but it closes with a cheerful

view of the happy future that awaited both of them: "Well dearest I'm going thru it all and then we can be happy and have our *whole* lives to pay it. Your own 'goin' to be brave girl Ruth." Dying declarations do not find expression in the language of Ruth Ayer's letter.

It will be presumed that the jury was composed of reasonable men. A juror may have been in doubt as to whether his memory with respect to certain material statements in the letter was correct, and, if so, it follows that, after reading it, he would then stand more firmly for conviction, or for acquittal, as the material statements, or lack of such statements, might seem to him to indicate. The rule is salutary, and obviously it is as important for the protection of the innocent as for the conviction of the guilty. Clearly Miss Ayer's letter to Watson shows a conspiracy to do the unlawful act with which defendant is charged and in which the proof tends to show he participated.

The letter of the decedent upon its face bears the imprint of verity. It does not contain an expression that suggests fabrication or invention. It is free from the infirmity of memory or the doubt of sincerity. The suspicion, or even the suggestion, of self-interest is absent that so often attends the spoken word of a witness who purports to repeat the language of a person since deceased. The conclusion is that the letter is a part of the *res gestae,* and that the court did not err in admitting the letter in evidence nor in granting the request of the jury to take it, as one of the exhibits, upon retiring to the jury room.

*Russell v. State,* 66 Neb. 497, is in point. Chief Justice Sullivan in writing the opinion of the court said: "The modern practice, as we understand it, both in civil and criminal cases, is to send to the jury room all instruments, articles and documents, other than depositions, which have been received in evidence, and which will, in the opinion of the trial judge, aid the jury in their deliberations. 12 Ency. Pl. & Pr. 591; 2 Thompson, Trials (2d

ed.) sec. 2575. In *Langworthy v. Connelly,* 14 Neb. 340, Mr. Justice Cobb, after a careful examination of numerous cases, reached the conclusion that 'in the absence of statutory direction it is, in a great measure, left to the sound discretion of the court as to what papers, books or other matters of evidence, or instructions, the jury will be permitted to carry with them to their room upon retiring to consider of their verdict.' "

In *Lamb v. State,* 69 Neb. 212, we said: "When a conspiracy is once shown to exist by the requisite *quantum* of proof, the acts and declarations of each of the conspirators, in furtherance of the common design, are the acts and declarations of all." See *Clark v. State,* 102 Neb 728; *Neal v. State,* 104 Neb. 56; *Katleman v. State,* 104 Neb. 62.

In *State v. Crofford,* 133 Ia. 478, it is said: "The victim of an abortion may be a conspirator to commit the act although not generally regarded as an accomplice; and where conspiracy on her part is shown her declarations in furtherance of the design, in case of her resulting death, are admissible against her coconspirators on trial for the substantive crime."

In *Solander v. People,* 2 Colo. 48, the court declared: "A woman may conspire with others to procure miscarriage of her own person, and, the conspiracy being shown, her acts and declarations in furtherance of the common design are evidence against others engaged with her in the criminal act."

In *Johnson v. People,* 33 Colo. 224, where defendant was prosecuted for murder, resulting from an abortion alleged to have been committed by him, this was said: "Where deceased sought the services of defendant and voluntarily submitted to the operation, the declarations of deceased made to her husband soon after and closely attendant upon the attempt to produce the abortion, to the effect that defendant had operated upon her and produced a miscarriage, was admissible in evidence."

In *People v. Atwood,* 188 Mich. 36, the court say:

"Where the people had proved that deceased was pregnant, that an abortion had been committed, and that it caused her death, and where the relations of respondent and deceased supported an inference that he knew her condition, that she would not have an operation performed without his knowledge, and that he was cognizant of the crime, evidence that on the night she left her home and remained away she seemed in good health and spirits, and said that she was going to meet respondent, was admissible as verbal acts accompanying her going away, and whether they truthfully explained her conduct and purpose was for the jury."

To the same effect is *State v. Power,* 24 Wash. 34, where the defendant was prosecuted for causing death by producing a miscarriage. *State v. Dickinson,* 41 Wis. 299; *State v. Howard,* 32 Vt. 380; 22 C. J. 458, secs. 547, 548.

In criminal prosecutions it is held generally that the declaration of a conspirator may be shown against another conspirator unless the act was done or the declaration was made at a time when the conspiracy was not in existence, or was not in furtherance of the common design. Whether the act or the declaration was in furtherance of the purpose of the conspiracy is for the jury to determine. 16 C. J. p. 665, sec. 1330, p. 666, sec. 1331; *Neal v. State,* 104 Neb. 56.

In discussing the rule of *res gestae* this has been said: "The range of events included by the term *res gestae* varies according to the circumstances of each particular case. The principle upon which these declarations are admitted is their spontaneous and undesigned character and their explanatory or illustrative value in conjunction with the main event. It is impossible to lay down any general rule upon the question of what declarations do or do not constitute a part of the *res gestae.*" Underhill, Law of Evidence, sec. 56.

Defendant says that, when the jury were returned to the jury box after being out almost a day and a night, the

court made some observations that were in effect instructions. The court reporter was not present and the only record with respect to what the court may have said is contained in the joint affidavit of counsel. Granting that the affidavit reflects what was said, the observations cannot be called instructions. It would be absurd to hold that a district judge should be compelled to sit upon the bench like an automaton. The remarks were general in their nature and prejudicial error was not thereby committed.

Defendant's application for a new trial on the ground of newly discovered evidence was properly denied. The affidavits of the respective parties on this feature of the case are conflicting, but the court did not err in denying the motion.

Other alleged errors are assigned in defendant's brief. We have examined all of them, but do not find it necessary to discuss them here, more than to observe that they do not present reversible error.

The judgment is

AFFIRMED.