STATE, EX REL. C. A. SORENSEN, ATTORNEY GENERAL, APPELLEE, V. LILBURN B. LAKE, APPELLANT.

FILED MAY 29, 1931. No. 27634.

*William N. Jamieson, D. M. Murphy* and *Ray W. McNamara,* for appellant.

*C. A. Sorensen, Attorney General,* and *Homer L. Kyle, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and PAINE, JJ.

PAINE, J.

This was an action brought by the state of Nebraska, on relation of the attorney general, as a result of which the secretary of the department of public welfare of the state of Nebraska revoked the license of the defendant to practice medicine.

The petition charged that Lilburn B. Lake, the defendant, was licensed by the department of public welfare of the state of Nebraska to practice the profession of medicine and surgery in the state of Nebraska and was engaged in such practice in Omaha by virtue of such license. The petition also charged that said defendant, Lake, was guilty of an act and offense for which his said license to practice the profession of medicine and surgery in Nebraska should be revoked, to wit, immoral, unprofessional, and dishonorable conduct, in that said defendant did, on or about the 12th day of January, 1929, procure or aid in procuring a criminal abortion upon Mrs. Rhoda Hoyt, of Omaha, Douglas county, Nebraska. The defendant filed a general denial.

A hearing was had before Ernest M. Pollard, secretary of the department of public welfare of Nebraska, and an order revoking and canceling the license of said defendant to practice his profession was duly entered.

Thereupon appeal was taken to the district court for Douglas county, a trial had to the court, and on April 24, 1930, a decree was rendered herein, affirming the order of the department of public welfare. Motion for new trial was overruled by the court, and a notice of appeal was filed and the case was brought before this court for review.

There is little agreement on the facts in this case, but the plaintiff insists that the evidence shows that Mrs. Rhoda Hoyt died at the Methodist Hospital in Omaha on February 16, 1929, from general septicemia which resulted from an abortion performed by the defendant; that she left surviving her an adopted boy and her husband, who has since remarried.

It appears that Mrs. Hoyt first called at the office of her family physician, Dr. Glenn Miller, on January 8, 1929, who found her about five weeks along in pregnancy, but said she needed no medicine and that her condition was entirely normal.

Three nights later Mrs. Hoyt told her husband that she had visited Dr. Lake, the defendant in this case, and had told him of her great difficulty, the winter before, in having a child born dead, and that the defendant had told her he did not blame her for not wanting to go through pregnancy again, and that he would charge $35. On the next evening, January 12, Mrs. Hoyt told her husband that she had had the abortion performed that day. She described the instruments that he used and the technique of the operation, but her husband refused to give her money to pay for it. On leaving home in the afternoon, she had left her adopted boy with a neighbor, Mrs. Brown, to whom she had already told of her pregnancy, and this neighbor in that conversation had advised her against having an abortion performed. She reported that on her return from her first trip to the defendant there was "nothing doing," and when she returned from her second trip she said there had been "something done." At 4:30

on the morning of January 23 Mrs. Brown was called, and Mrs. Hoyt had had a uterine hemorrhage and later fainted, and after her husband went to work at 6:30 a. m., Mrs. Brown called Dr. Lake from a neighbor's telephone, as they had none in the house. In response thereto Dr. Lake arrived with his instruments, which Mrs. Brown helped him sterilize in a dishpan, and he gave Mrs. Hoyt a surgical packing; while the defendant insists that this is the first time that he had been called on the case, that he knew nothing about the nature of the case and brought no instruments with him. He made repeated visits to her home, and on January 27 she had another hemorrhage upon her return from church and went to Dr. Lake's office that afternoon with her husband, at which time he paid Dr. Lake $5 on his bill. Her condition changed for the worse and upon the evening of February 1 Dr. Lake recommended that she be taken to a hospital, at which time the husband discharged Dr. Lake, who had nothing further to do with the case. The family physician, Dr. Miller, was called and found her temperature 105 and had her given the best of hospital care. In spite of several blood transfusions she grew steadily worse and died February 16, 1929. For the last ten days of her life she was too weak even to move her hands without assistance. She had lost the entire sight of one eye by an abscess from the infection, and during this time she made statements that she believed she was about to die. She said to Albert Hanna, "Goodbye, Mr. Hanna, it is all over with me now." On February 6, and at other dates thereafter, she said she gave up the ship, and asked her husband what they would do with the adopted boy.

1. In the assignments of error it is insisted that the court erred in admitting into evidence testimony as to alleged dying statements made by Rhoda Hoyt, covering the circumstances leading up to the cause of her sickness and her resulting death, being statements by certain witnesses as to conversations had with decedent, which defend-

ant claims did not in fact and in law constitute dying statements, insisting that, this not being a criminal prosecution involving manslaughter or murder charges, said purported dying statements are not admissible in evidence.

Defendant cites from a case in which a defendant poisoned his daughter-in-law: "A statement made by one who is ill and vomiting, but who had said nothing to indicate that he realized that he was dying, was not admissible as a dying declaration." *State v. Swenson,* 26 S. Dak. 589. He also cites from 30 C. J. 255, sec. 498: "The fact that the declarant believes himself in great danger and entertains a fear that he must die is not sufficient." And he calls attention to the case of *Thrasher v. Board of Medical Examiners,* 185 Pac. 1006 (44 Cal. App. 26), wherein the following pertinent syllabus occurs in a similar case, also brought to revoke a license for an abortion: "Dying declarations are not admissible in a proceeding before the board of medical examiners to revoke a license to practice medicine, or in any other proceeding, except in criminal cases of homicide."

It may be granted that ordinarily such evidence is only admissible in criminal cases, yet in 10 Boston University Law Review, 470-487, it is stated that many exceptions have been made to this rule, and that as early as 1761 the dying statement, made three weeks before his death, of a scrivener of a will, to the effect that the will was a forgery, was admitted in evidence. Many courts have evinced a strong tendency to admit dying declarations as part of the *res gestæ* when they are not too remote in time, and the writer of this article insists that there is a drift in recent years to more liberality in the admission of such statements, and that the probative force of a dying declaration should be no greater in a prosecution for homicide than in a civil action for wrongful death growing out of the same facts, and insists that the rule should be extended to allow dying declarations to be admitted in civil actions when they are made before the action is begun.

In 3 Wigmore, Evidence (2d ed.) 164, the author says: "In several jurisdictions the aid of the legislature has been invoked to stop the further defiance of common sense by the courts over such monstrous trivialities, and to admit dying declarations in charges of abortion and related offenses"—citing cases from Ohio and Massachusetts.

In 9 Oregon Law Review (Feb. 1930) 174, in an article on the same subject, we are told that in 1909 an amendment was passed by the legislature of Oregon which struck out the words "in criminal actions" in reference to dying declarations, and therefore in that state such declarations are admissible in civil cases as in criminal cases. In *Thurston v. Fritz*, 91 Kan. 468, we are told that in Kansas dying declarations are permitted in civil cases, and in Massachusetts, Missouri, New York, Ohio, Pennsylvania and North Carolina such declarations are now permitted in certain forms of civil actions.

The plaintiff suggests that, even if the dying declarations were not proper in a civil case, they were clearly admissible as part of the *res gestæ*, and also admissible as statements of a co-conspirator, citing the admission in evidence of Miss Ruth Ayer's letter to her sweetheart, Watson Alexander, of Hayes Center, Nebraska, as found in *Fields v. State*, 107 Neb. 91; but it must be noted that this was a criminal prosecution, in which Dr. Fields was sentenced to the penitentiary for performing the abortion which resulted in her death. In *Edwards v. State*, 113 Neb. 698, is found a very full discussion of the same subjects by this court.

In *Mathews v. Hedlund*, 82 Neb. 825, all of the earlier cases upon revoking licenses of physicians are reviewed, and we read: "The judgment should be affirmed if all of the jurisdictional facts were established by any competent evidence, even though opposed by other and weighty evidence. In referring to the evidence as 'competent' we mean evidence competent for that character of proceedings."

Judge Fawcett, in the second hearing of *Munk v. Frink*,

81 Neb. 631, says: If defendant has been given "full opportunity to appear in person or by counsel to cross-examine the witnesses against him, and to introduce testimony in his own behalf, * * * the findings of the board as to the sufficiency of the evidence, * * * will be upheld, unless it appears there is no evidence to sustain such findings."

The laws relating to revocation of a license to practice medicine and surgery, as found in sections 71-601 to 71-615, Comp. St. 1929, permit such license to be revoked for fraud in securing the license, drunkenness, untruthful statements in his advertising, or for failure to pay his annual renewal fees. If a license may be revoked for such things, why should the authorities hesitate in revoking a license for performing a criminal abortion resulting in death?

The statute provides that the proceeding shall be summary in its nature and triable as an equity action (Comp. St. 1929, sec. 71-609), and if appealed to the district court it must be advanced over all other cases except compensation and criminal cases (Comp. St. 1929, sec. 71-614), and if appealed from district court no bond except for costs shall be required, and that the giving of such cost bond does not restore the right of defendant to practice his profession pending appeal to this court (Comp. St. 1929, sec. 71-615).

In a very similar case the New Jersey court overruled an objection that the action for revocation of license was not brought until after a criminal prosecution for the abortion had been barred by the statute, and say: "The statute authorizing revocation of the license is not intended as a punishment of the physician for the crime involved, but as a protection of the public, and the statute of limitations is no defense to this proceeding." *Blumberg v. State Board of Medical Examiners*, 96 N. J. Law, 331.

The relation of physician and patient is of such a confidential and serious nature that the moral character of a

physician is considered highly important. In this case the defendant is charged with immoral, unprofessional and dishonorable conduct.

The court is convinced, by a careful reading of the whole evidence in this case, that the defendant brought about the criminal abortion upon the deceased, Mrs. Rhoda Hoyt, and that this abortion was not brought about by her taking quinine or taking an automobile ride, as the defendant naively suggests in his testimony.

This case was tried to the court as an equity case, and it has frequently been held that it is unnecessary in such cases to pass upon assignments of error in the admission of evidence upon review in this court. It will not be presumed that the trial court acted upon or considered incompetent evidence and the action of that court in admitting evidence will not be reviewed. *Rozean v. State,* 109 Neb. 354; *Kemmerling v. State,* 89 Neb. 98; *State v. Knight,* 204 Ia. 819.

The district judge entered an order reading in part: "Wherefore, it is considered, ordered and decreed by the court that the order herein entered February 14, 1930, by the department of public welfare of the state of Nebraska revoking and canceling the license and certificate heretofore granted to the defendant Lilburn B. Lake to practice the profession of medicine and surgery in the state of Nebraska be, and hereby is, affirmed."

This order is right and is hereby

AFFIRMED.

EBERLY, J., concurs in result.