GEORGE RIDENOUR, APPELLEE, v. SOL LEWIS ET AL., APPELLANTS.

FILED OCTOBER 30, 1931. No. 27982.

*Dressler & Neely,* for appellants.

*G. F. Nye* and *Harry W. Shackelford, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

EBERLY, J.

This is an appeal from a judgment of the district court for Douglas county awarding appellee death benefits provided by the workmen's compensation law as a partial dependent of his deceased son.

The contested issues in the trial court were: (1) Was the deceased son shot and killed by a highwayman? (2) Did his death "arise out of his employment?" (3) Was the father (appellee) partially dependent on the deceased? (4) And, was error committed by the district court in overruling appellants' motion for a new trial based on newly discovered evidence?

These questions are in effect now presented to this reviewing court for determination *de novo.* A careful exam-

ination of the bill of exceptions sustains the conclusion that there is no substantial conflict of evidence in this case. The controversy is largely one of law and includes appellants' challenge to the competency of the evidence in the record to establish the existence of certain essential incidents which, together with certain undisputed facts, make up the transaction involved.

It is established by the evidence that on September 2, 1930, Robert Ridenour, unmarried and twenty-five years of age, a son of the plaintiff (appellee), was, and for a year prior thereto had been, employed by defendant Sol Lewis at a weekly wage of $22 a week, of which $10 a week had been by the son, during this employment, contributed to his father's family. The duties imposed on the son by this employment included the installation of radios, the repair and "servicing" thereof, and the making of collections for his employer. In the performance of these duties Ridenour ordinarily made use of a green Ford roadster, of which he was the owner. This car was equipped with a ladder slung under the body thereof, and a radio test box was carried in the car. This equipment was the property of the employer. After putting in the forenoon of September 2, 1930, in his employment at the employer's place of business, between 1 and 1:30 p. m. Ridenour drove away therefrom with the green Ford roadster, carrying the usual equipment. He also had in his possession a bill in favor of his employer for collection. His immediate mission, however, was to install a radio that had been sold and delivered from the store of defendant Lewis. About 2 o'clock thereafter a report of a firearm was heard in Hummel Park in the north part of Omaha by the caretaker and the patrolman there on duty. They proceeded at once to investigate. For this purpose in a Ford they drove in a general northeasterly direction along the park boulevard which at this point is laid out in a "winding hairpin drive." As these persons "made the last bend out of the park" they discovered Ridenour's green Ford roadster, with its usual equipment, standing a little to the left of the park entrance "going out," and approx-

imately at 100 to 150 feet from the "river road" with which the drive over which they were traveling connected. Ridenour was also there lying on the ground 50 or 60 feet from the green Ford car with his head toward the driveway as though he had been dragging himself. He was then badly bleeding from a bullet wound in the right side of his chest, and the front of his body was covered with blood which saturated his clothing. These parties reached the wounded man approximately ten minutes after the shot was heard, and found him practically in a totally disabled condition, due to the wound and the loss of blood occasioned thereby. Asked by them what had happened, Ridenour replied, in substance, that he had been shot; that two men in a blue Chevrolet sedan had come alongside his car while he was en route to his appointment; one of these men got into his car and with a knife forced him to drive out to the park, and there attempted to rob him; that in a fight that followed his assailant got the best of him, took the revolver away from him, and shot him; that after the shooting the blue Chevrolet came along and the shooter got into it and was driven rapidly away. There was but one gunshot wound on Ridenour's person at this time, which was later described by the physician performing the autopsy on Ridenour's body after his death, as a bullet wound with an entrance three inches above and one inch to the left of the right nipple and about two inches below the right clavicle; that its course was to the right and slightly downward, fracturing the third rib, passing through the upper lobe of the right lung, making its exit from the pleural cavity by fracturing the fourth rib in the axillary line, then passing through the right scapula lodging in the soft tissues close to the scapula itself. From this point the bullet, a flattened 38 caliber, was removed.

These park officers immediately called up the central police station of Omaha by telephone, and "around fifteen minutes after receiving the call" the city police officers had arrived at the scene of the shooting. At the time of their arrival they found Ridenour in a serious condition; "blood squirting out of his wound," and it was evident that he

was fast weakening. In the next four or five minutes a brief examination of the green Ford roadster and the vicinity was made by the officers, and Ridenour was taken into the police car and conveyed to the hospital. Though they found the wounded man "in quite a bit of pain," yet he repeated to these officers at the scene of the shooting and en route to the hospital substantially the statements first made by him, with added details. He lapsed into unconsciousness on arrival at the hospital. At the scene of the shooting the police officers inspected the green Ford roadster of deceased and found therein a loaded revolver with the cartridge in the chamber under the hammer discharged, and also a penciled note written on the bill which deceased had for collection. This note constitutes exhibit 1 of the record. It was later identified as being in the handwriting of the deceased, and was referred to by him in reply to the officers' questions at the scene of the crime as a note written by him after he was shot because of his fear that he would or might die before any one discovered his condition. Exhibit 1 was offered but not received by the trial court, and is as follows:

"To (two) men about 25-27 pulled along side me at 23 Clark. One got on side of my car and asked if I was going up town. Said no and he got in and stuck a knife in my side, forced me to turn no (north) at 22. He said he stick the knife clear thro (through) me if I made a move. Told me to drive out here. He said give me the deposit quick. After stoping (stopping) he started looking for money. He took mine. The second fellow pulled up in back. It was a shevi (Chevrolet) sedan, new one. They thought my test case had money in it. These same 2 fellows I saw sitting in front of Omaha bank about 4 or 5 times when I made deposit. I always take test case in with me so as not to have it stolen. They must have thought it was money bag. I carry gun in back of cushion. In trying to get it I was too late. We fought for it. I got it—the bullet. He jumped out and got in chevi (Chevrolet) with other man."

Ridenour died on the third day thereafter from the effect of the bullet wound received.

Independent evidence also establishes the fact that on the afternoon of the assault, shortly prior to the shot heard in the park, Ridenour's car, occupied by two persons, unidentified, closely followed by a blue Chevrolet sedan automobile, was being driven rapidly over the highway in the direction of Hummel park.

Appellants contend that the foregoing statements made by Ridenour immediately following his discovery near Hummel park, as well as the statements made by him to the police officers en route to the hospital, made in response to questions, and which were admitted in evidence over objections, were in the nature of hearsay, constituted no part of the *res gestæ*, and as "dying declarations" were admissible only in criminal prosecutions for homicide.

The principle of evidence restricting the competency of dying declarations to homicide cases has long been recognized and adhered to in this tribunal. However, in the recent case of *State v. Lake, ante*, p. 331, a majority of this court has now approved a decided modification thereof. It was there held that "dying declarations" were admissible in a statutory proceeding brought to secure the revocation of the license of the defendant, a physician, to practice medicine. It may be said that the case just referred to is a review *de novo* of a statutory administrative procedure, and that the issue actually determined therein was necessarily narrowed by the inherent nature of the action then before this court and the rules of evidence heretofore approved by this court as applicable thereto. *Munk v. Frink*, 81 Neb. 631; *Mathews v. Hedlund*, 82 Neb. 825. Still it is to be noted that the precedents cited, expressly approved by this court in this opinion, in principle, unless limited, would apply to and control the present proceeding. In view of the inherent nature of the present proceeding, particularly the provisions of section 48-139, Comp. St. 1929, and the rule of liberal construction applicable to our workmen's compensation act, as to both substantive and adjective provisions (*Selders v. Cornhusker Oil Co.*, 111 Neb. 300; *McGuire v. Phelan-Shirley Co.*, 111 Neb. 609; *Baade v. Omaha Flour Mills Co.*, 118 Neb. 445; *Speas v.*

*Boone County,* 119 Neb. 58), no good reason appears to justify the creation of an exception here to the rule announced in the *Lake* case, and it would follow that "dying declarations" otherwise competent would now be admissible in evidence and a verdict based thereon would be sustained. The majority of this court, however, is of the opinion that the statements made by Ridenour at the scene of the tragedy and en route to the hospital therefrom, so far as admitted in evidence by the trial judge, are plainly within the limitations of the *res gestæ* rule, and it is not essential to the support of the present judgment that the competency of dying declarations in workmen's compensation cases be determined at this time. The question therefore is not decided.

This jurisdiction has long been committed to the view that, in cases similar to the one here presented, "The trial court must be permitted to exercise its discretion, very largely, in determining whether the declarations were made under such circumstances as to permit the inference that they were genuine expressions, and the jury must be left to determine whether or not such inference shall be drawn." *Hewitt v. Eisenbart,* 36 Neb. 794. See, also, *Omaha & R. V. R. Co. v. Chollette,* 41 Neb. 578; *Missouri P. R. Co. v. Baier,* 37 Neb. 235; *Pledger v. Chicago, B. & Q. R. Co.,* 69 Neb. 456.

"The fact that death impends at the time of utterance of the statements may have the effect to render them admissible, it seems; and so the fact that the declarant died subsequently and within a comparatively brief period is an element to be considered in determining admissibility of statements in any particular case." 10 R. C. L. 989, sec. 172. Also, see *Pledger v. Chicago, B. & Q. R. Co.,* 69 Neb. 456, 461; *Louisville, N. A. & C. R. Co. v. Buck,* 116 Ind. 566; *Marshall v. St. Louis, I. M. & S. R. Co.,* 78 Ark. 213; *Starr v. Aetna Life Ins. Co.,* 41 Wash. 199.

So, too, the principle of evidence which has been loosely referred to and termed *"res gestæ"* has been broadened and developed "in modern times, by an effort to afford the triers of fact all reasonable means of ascertaining the

truth, instead of withholding from them all information possible by the rigid application of certain rules of exclusion. The question is not now, how little, but how much, logically competent proof is admissible." 10 R. C. L. 975, sec. 158. See, also, *Insurance Co. v. Moseley*, 8 Wall. (U. S.) 397; *Stukas v. Warfield-Pratt-Howell Co.*, 188 Ia. 878; *Peterson v. Phillips Coal Co.*, 175 Ia. 223; *Roach v. Great Northern R. Co.*, 133 Minn. 257.

The case of *Insurance Co. v. Moseley, supra,* has been repeatedly cited with approval by this court, and the principle announced therein is apparently controlling in the present case. Under the terms of the accident policy in suit in that case, it was essential for plaintiff to establish that the death of Moseley was due to an accident as defined by the policy. The sole evidence on this subject was the testimony of the wife and son of the deceased. The former testified that the assured left his bed Wednesday night the 18th of July, 1866, between 12 and 1 o'clock; that "when he came back he said he had fallen down the back stairs and almost killed himself; that he had hit and hurt the back of his head in falling down the stairs;" that "she noticed that his voice trembled," and he "appeared faint" and "in great pain." The son, testifying in behalf of his mother, stated "that he slept in the lower part of the building occupied by his father; that about 12 o'clock of the night before mentioned he saw his father lying with his head on the counter, and asked him what was the matter; he (the father) replied that he had fallen down the back stairs and hurt himself very badly." Justice Swayne, in delivering the majority opinion of the court, approved the action of the trial court in admitting these statements in evidence, observing that "the *res gestæ* are the statements of the cause (of the bodily injury) made by the assured almost contemporaneously with its occurrence, and those relating to its consequences made while the latter subsisted and were in progress."

Consistent with this it is said: "This general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excite-

ment may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts." 3 Wigmore, Evidence, sec. 1747. See, also, *Dodson v. State,* 119 Neb. 340.

It follows that the evidence objected to was properly received under the circumstances of the present case, and, to the points to which it was directed, is competent evidence to sustain the judgment.

It seems to be well settled that injuries caused by intentional assaults are compensable if they arise out of, or result from, a risk connected with the employment. *Socha v. Cudahy Packing Co.,* 105 Neb. 691; *Nelson v. Service Oil Co., ante,* p. 762. This court is committed to the view that, when an employee is sent into the public street, under the circumstances detailed in this record, on his master's business, his employment necessarily involves exposure to all risks of the street, and injury from any such cause, not involving what is often referred to in the books as an "Act of God" (*Gale v. Krug Park Amusement Co.,* 114 Neb. 432), arises "out of the employment," within the meaning of the workmen's compensation act. *Coster v. Thompson Hotel Co.,* 102 Neb. 585. Also, in *City of Fremont v. Lea,* 115 Neb. 565, 572, a case involving injuries occasioned by the accidental discharge of a toy cannon on the public streets of a city, the following language appears in the opinion:

"It is insisted, however, that the accident occurred upon the public streets of Hastings, and that the danger created

by the accidental discharge of the cannon was one to which the public, generally, was exposed, and not one which arose out of, or was inherent in, Lea's employment. Under the facts in this case, the question here raised is foreclosed by our previous decision. Even though the accident be sustained by reason of risk incidental to the streets, the accident, under the circumstances of this case, arises out of, as well as in, the course of his employment. *Coster v. Thompson Hotel Co.*, 102 Neb. 585.

"This case is supported by the weight of authority. *Refuge Assurance Co. Ltd. v. Millar*, 5 Butterworth, Com. Cas. (Eng.) 522; *M'Neice v. Singer Sewing Machine Co. Ltd.*, 4 Butterworth, Com. Cas. (Eng.) 351; *Bett v. Hughes*, 8 Butterworth, Com. Cas. (Eng.) 362; *Dennis v. White & Co.*, 2 K. B. Div. 1916 (Eng.) 1; *Pierce v. Provident Clothing and Supply Co. Ltd.*, 1 K. B. Div. [1911] (Eng.) 997; *Milwaukee v. Althoff*, 156 Wis. 68; *Matter of Katz v. Kadans & Co.*, 232 N. Y. 420; *Matter of Roberts v. Newcomb & Co.*, 234 N. Y. 553; *Foley v. Home Rubber Co.*, 89 N. J. Law, 474.

"The language restricting a master's liability for compensation under our compensation act to 'an accident arising out of, and in the course of, employment' was first used in the English act. These words, in this connection, appear in practically all of the American compensation statutes. The English act was largely the source of American legislation. The phrase, 'arising out of, and in the course of employment,' was construed with reference to street risks by the House of Lords in the case of *Dennis v. White & Co.*, 2 K. B. Div. (Eng.) 1. In this decision, which publicists generally concede as one of the most important decisions under the compensation acts ever handed down, that tribunal laid down the law with reference to street accidents as follows:

" 'Where a workman is sent into the streets on his employer's business, whether habitually or occasionally, and whether on foot or on a bicycle, or on an omnibus or a car, and he meets with an accident by reason of a risk of the streets to which his employment exposes him, the ac-

cident arises out of as well as in the course of his employment; and it is immaterial that the risk which caused the accident is one which is shared by all members of the public using the streets under the like conditions.'" See, also, *Lawrence v. George Matthews, Ltd.*, 1 K. B. Div. (Eng.) 1; *Industrial Commission v. Pueblo Auto Co.*, 71 Colo. 424; *Stark v. Wilson*, 114 Kan. 459.

It would follow in the instant case that where the employment involved the installation, repair, and "servicing" of radios sold by the master, and also the collection of the master's accounts by the employee, and where such employee passing along the public streets pursuing his employment, with one of such accounts then in his possession for collection, is there assaulted for the purpose of robbery, and therein and thereby receives wounds causing his death, such injury arises out of, and in the course of, his employment.

We have carefully considered the showing made by the defendants in support of the motion for a new trial on the ground of newly discovered evidence, and conclude that in the denial of the same no abuse of judicial discretion on the part of the trial court was disclosed; and that, likewise, the trial court correctly determined the question of dependency of the claimant on the deceased.

It follows that, no error appearing in the proceeding, the judgment of the trial court is, in all things,

AFFIRMED.