ALFRED W. TONGUE, APPELLANT, v. EDWARD E. PERRIGO, APPELLEE.

FILED MARCH 13, 1936. No. 29542.

*Anson H. Bigelow,* for appellant.

*Johnsen, Gross & Crawford, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY, PAINE and CARTER, JJ.

DAY, J.

This is an action for damages brought by the father of a minor child for seduction resulting in an infection which caused death. At the close of plaintiff's testimony, the court sustained defendant's motion to discharge the jury and dismiss the cause. The plaintiff appeals.

The record presents two questions for our consideration. The first is the sufficiency of the evidence to establish defendant's sexual relations with plaintiff's daughter, the infection as a result thereof, and that said infection communicated by defendant was the cause of his daughter's death. The second relates to the alleged errors in the exclusion of certain testimony at the trial.

The defendant questions the right of the plaintiff to maintain this cause of action. The theory of plaintiff is that he is entitled to recover under any of three theories; either seduction, or debauchery, or sexual intercourse with attendant disease or death. It is unnecessary to determine which theory, under the law, if any, would permit the maintenance of such an action. Under any theory of this case, it would be necessary to establish that defendant had sexual relations with plaintiff's daughter. This is the basic foundation of any such action.

An examination of the evidence is necessary to determine its sufficiency on the question of sexual relations. In December, 1930, the plaintiff had three daughters; Dorothy, aged 19, Elizabeth, aged 17 years (the one involved in this action), and Roberta, aged 8 years. At that time they were members of dancing classes conducted by Miss Grace Abbott, and as such participated in a revue presented for one week at the Orpheum Theater during the Christmas season. It was upon this occasion that the girls became acquainted with the defendant, Edward E. Perrigo, who was then the director of the orchestra at the theater. During the winter and spring of 1931, Elizabeth, while a senior in Technical High School, worked at a ten-cent store after school until 6 o'clock. Some weeks after Elizabeth Tongue appeared in the revue at the Orpheum, she was employed by defendant to work two hours in the evening at the theater, sorting, repairing, and filing orchestra music and doing some typewriting. She went directly to the theater when she finished her work at the dime store. She usually worked from 6:30 to 8:30 in the evening in the defendant's office which was in a remote part of the building. But, after some time, she

frequently came home later than was required by her work. This seemed to occasion the plaintiff no unusual concern until one night just before Christmas in 1931. Elizabeth attended a party at the Elks Club and was taken to her work by her mother in a cab at about 10:30 at night. If she did the required two hours work that night, she would have finished at about 12:30 in the morning. Perrigo took her home in his car upon several occasions, and that night got her home between 1 and 1:30 in the morning. That time, Mr. Tongue went out to the car, and an argument occurred between him and the defendant. Since the plaintiff relies upon admissions made by the defendant in a conversation between the deceased, the defendant, and the plaintiff to establish the fact of sexual relations between the defendant and his daughter, Elizabeth, we set out the plaintiff's testimony as to this conversation, as follows:

"I stepped across the street and I said, 'What do you mean by keeping Elizabeth out to this hour of the night?' He answered, 'She has been a very sick girl.' I said, 'In that case why didn't you call me up on the 'phone and let me know or bring her right home.' He said, 'I took care of her at my office.' I said, 'Your office is no-place for a sick girl at this time of night; her place is at home.' And he then said, 'I was giving her good care at my office.' And I said, 'She got through at 10:30, it is now 1:30; what else were you doing with her besides taking care of her?' And I turned to Elizabeth and said, 'What has this man been doing with you at the office? Has he been taking care of you down at that office of his?' And she said to me, 'Eddie is all right,' she said, 'We love each other.' I said, 'Love, what do you call love?' I said, 'Do you mean that this man has actually been taking advantage of you in the wrong way at that place there?' And then I turned to him and said, 'What have you done to her?' And she said to me, breaking into our conversation, she said, 'Eddie is all right, Daddy,' she said, 'We are going to be married.' That made me mad. I said, 'Married,' I said, 'He is already a married man,' I said, 'Don't be a little fool.' And I turned to him

and I said to him, out straight, 'She is not going to work at your office after tonight.' He said, 'Well, * * * we understand each other,' and he said, 'We know exactly what you mean, what seems wrong to you.' And then Elizabeth broke in again, and she says, 'Eddie is treating me right, we are going to be married.' * * * I said to her, I was angry, too, by this time, I said, 'This is the last time you will work down at that office; now,' I said, 'Get out of this car and damn quick,' * * * and I went around the other side where Elizabeth was sitting to get her out of the car, and when I got there Elizabeth said, 'There is no use yelling about this.' And he says, 'And don't you say no more to me, the damage is already done.' I said, 'Well, I will do some damage to you.' I says to Elizabeth, 'Get out of this car' * * * and took her across the street."

It is to be remembered that this is the plaintiff's testimony of what occurred that night. The language is that of the plaintiff. But, giving it the construction most favorable to the plaintiff, it falls far short of an admission by the defendant of illicit sexual relations with Elizabeth Tongue. It might furnish the material for one to moralize upon the propriety and conventionality of the defendant, a married man, making an engagement for a future marriage. His motives, judgment, and good sense might well be questioned, but that is insufficient to establish the cause of action pleaded in this case.

The conclusion the plaintiff now draws from this conversation is not persuasive with us. While he forbade Elizabeth working for defendant after that time, it seems she continued to do so with his knowledge until she left for Denver in March, 1932. Thereafter, her sister, Dorothy Tongue, knowing of this circumstance, took over the work formerly done by Elizabeth and continued to work for defendant for some five or six weeks. While the plaintiff states he did not know of this, Dorothy was living at home at the time, and this work required her to be absent from home until 8 o'clock in the evening. Under these circumstances, we are constrained to doubt that the Tongue family

concluded from this conversation or any other circumstances up to that time that the defendant had seduced, debauched, or had improper relations with Elizabeth.

From these circumstances, it seems more reasonable to suppose that Mr. Tongue very properly wanted to avoid an embarrassing entanglement of his daughter with a married man. There was more than a friendly attachment between the defendant and Elizabeth Tongue. Foolish and unwise as this affair must be admitted to be, still there is not one syllable of competent direct evidence establishing sexual relations between defendant and Elizabeth Tongue.

However, seduction, debauchment, or fornication are matters that may be established by circumstantial evidence. Are the circumstances, together with this conversation, sufficient that a jury might draw a reasonable inference that the defendant had sexual relations with Elizabeth Tongue. A material fact may be established by circumstantial evidence when it is such that reasonable and fair inferences therefrom produce moral certainty and conviction. *Sanborn v. Walters*, 145 Wis. 84, 129 N. W. 644.

It seems unnecessary to detail the circumstances of the entire acquaintance of defendant and Elizabeth Tongue. Elizabeth went to Denver in the spring of 1932 and, while there, was taken sick about May 15, was taken to a hospital, and died June 3, 1932, of acute ulcerative endocarditis. It is the contention of the plaintiff that, by reason of her sexual intercourse with defendant, she was infected with a venereal disease which caused her death. At common law, the gist of the action was loss of service, and the damage had to be the natural and direct result of the seduction. All the circumstances in this case are not such that a jury could reasonably and fairly infer that the defendant had sexual relations with Elizabeth Tongue. The trial court was not in error in dismissing the case with prejudice at the close of plaintiff's testimony.

Because of our foregoing conclusions, it ordinarily would not be necessary to discuss the testimony of the expert medical witnesses. However, since this opinion evidence

is contended to establish that the endocarditis which caused death was in turn the result of a gonorrheal infection, and is argued as one circumstance tending to prove sexual relations and infection by the defendant, it may well be noticed in this case. The expert testimony is not satisfactory. It contains highly argumentative statements of a medical advocate rather than scientific opinions designed to aid a court of justice. This attitude of the expert witness is disclosed in the answer of one to a question on cross-examination: "I think you know very little about it—not enough to question me expertly." Expert witnesses are called to assist courts and attorneys in the determination of questions of fact, and not as advocates of a scientific theory. The contention that gonorrheal infection was the cause of the endocarditis which caused the death of Elizabeth Tongue is only a theory, and all the witnesses admit that other things might have caused it. The conclusions of the medical experts are based upon suspicion, speculation, and conjecture. As stated above, it is not necessary for this court to determine whether the evidence on this question is sufficient to submit to a jury.

There are several assignments relative to the exclusion of evidence which was offered upon the trial. One exhibit was an affidavit signed by both Elizabeth Tongue and Susan Tongue, her stepmother, on May 26, 1932. This was eight days before her death. The only basis as to the circumstances surrounding this affidavit is contained in the affidavit itself. It is a peculiar instrument, a joint affidavit of the deceased girl and her stepmother. It appears from the evidence that the stepmother could have no personal knowledge of the material facts stated therein. The affidavit states that she had been attended by different doctors and had received no encouragement of the disease being curable. As a condition for the admission of a dying declaration, it must appear either from the statements of the declarant or from the circumstances of the case that he was in actual danger of death and had no hope of recovery at the time it was made. "The essential idea is that the belief

should be a positive and absolute one, not limited by doubts or reserves; so that no room is left for the operation of worldly motives." Wigmore, Evidence, sec. 1440. See *Shepard v. United States,* 290 U. S. 96. In *Ridenour v. Lewis,* 121 Neb. 823, 238 N. W. 745, this court discussed the previous decisions of this court and quoted the rule: "The trial court must be permitted to exercise its discretion, very largely, in determining whether the declarations were made under such circumstances as to permit the inference that they were genuine expressions, and the jury must be left to determine whether or not such inference shall be drawn."

Tested by these rules, the paper offered is not a dying declaration, because it does not appear from the declaration itself or from all the surrounding circumstances that the declaration therein was made under the expectation of impending death. If further dissertation is necessary, one may have an incurable disease, even one which will render one a helpless invalid, without a conscious sense of impending death. In most of the reported cases, where dying declarations have been received, death has followed within a few hours or a few days. Since this is not a dying declaration, it would not be admissible in any case.

It is, therefore, scarcely necessary to consider the contention of the appellant that this court has modified the rule of evidence which has long been recognized in this jurisdiction that the competency of dying declarations has been restricted to homicide cases. *State v. Lake,* 121 Neb. 331, 236 N. W. 762, is cited to support that contention. That was a statutory proceeding brought to secure the revocation of the license of the defendant to practice medicine. That was a review *de novo,* as a suit in equity, of a statutory administrative procedure. See *Munk v. Frink,* 81 Neb. 631, 116 N. W. 525; *Mathews v. Hedlund,* 82 Neb. 825, 119 N. W. 17. Furthermore, the declaration in that case was admissible as a part of the *res gestæ.*

In *Ridenour v. Lewis, supra,* the declaration was admitted in evidence by the trial court, in a workmen's com-

pensation case, as a part of the *res gestæ*. We are of the opinion that this court has not yet modified the rule by what was said *arguendo* by the justices preparing these opinions.

It is necessary for us to consider whether the profferred evidence should have been admitted here as a part of the *res gestæ*. The doctrine of *res gestæ* is somewhat obscure, but expressed in our language, and not in the abbreviated Latin phrase, its application to the admissibility of statements depends upon their being spontaneous and impulsive; the material inquiry being whether the statements offered as evidence were made at a time and under such circumstances as to induce the belief that they were not the result of reflection and premeditation. A distinct class, however, exists in the case of statements which themselves are facts constituting part of the transaction under investigation. 10 R. C. L. 976, sec. 159.

"To bring acts and declarations within the doctrine of *res gestæ,* they must be connected with, and grow out of, the act or transaction which is the subject-matter of inquiry so as to form one continuous transaction, and must, in some way, illustrate, elucidate, qualify, or characterize the act, and, in a legal sense, be a part of it." 10 R. C. L. 977, sec. 160.

In *Ridenour v. Lewis, supra,* we quoted with approval from *Insurance Co. v. Mosley,* 8 Wall. (U. S.) 397, as follows: "The *res gestæ* are the statements of the cause (of bodily injury) made by the assured almost contemporaneously with its occurrence, and those relating to the consequences made while the latter subsisted and were in progress." The statement to be admissible must be under such circumstances as to import probable verity and to exclude the probability of being idle gossip or premeditated falsehood. In *Edwards v. State,* 113 Neb. 698, 204 N. W. 780, *Fields v. State,* 107 Neb. 91, 185 N. W. 400, was referred to as follows: "The *Fields* case has to do with a homicide which grew out of a like unlawful operation as that involved here. It is there disclosed that a letter was

written by the young woman to her lover several days before the operation was performed. As a result of the operation she died shortly afterward. It was held that the letter was properly submitted to the jury on the ground that the statements therein were relevant, and, being so, clearly a part of the *res gestæ.*" . There the letter was written before and concerning the illegal operation. It discussed the cost of the operation and the means of paying for it.

We have in this case an unusual affidavit executed from five to fifteen months after the alleged seduction could have taken place. It contains conclusions and not statements of fact and is not couched in the natural and spontaneous language of an eighteen-year old girl. A statement to be admissible as a part of the *res gestæ* must have been spontaneous and impulsive, and made at a time and under such circumstances as to induce the belief that it was not the result of reflection and premeditation. The proffered affidavit meets none of the requirements of the rule. The same applies to a proffered letter. It was not made in contemplation of death. It was not a part of the *res gestæ.*

Certain other exhibits were excluded from evidence. Some holiday and other greeting cards, photographs and telegrams, which at most could only be cumulative as showing the unusually friendly relation between defendant and Elizabeth. Even if they were admissible (we think they were not), it was error without prejudice, because they do not tend to establish any fact, unless it was the friendly relation mentioned above, which is abundantly established without them.

The entire cumbersome record in this case has been examined with usual thoroughness, and we conclude that the evidence was not sufficient to establish plaintiff's cause of action, and that the trial court did not err in the exclusion of certain exhibits offered in evidence.

AFFIRMED.

PAINE, J., dissenting.

I respectfully dissent in this case.

To summarize briefly the amended petition, it was there charged that some time during April, 1931, the defendant enticed Elizabeth to his office or room in the theater building and there seduced her and did repeatedly have further acts of unlawful intercourse with her, and that she was under the age of 18 years and previously not unchaste, and that defendant did infect and inoculate her with gonorrhea, which injured her health, and through a lesion in the membrane caused pyogenic organisms to be introduced into her blood stream, which developed growths on the valves of her heart, from which she died June 3, 1932. That such seduction was accomplished by reason of her tender age, by his fraudulent and artful wiles, and by engaging her for a small weekly wage in a pretended employment, and by false promises to make her his future wife, all continued for about three months prior to the accomplishment of his design.

As I view the evidence of the plaintiff in this case, the jury would have been amply justified in finding the following state of facts: Perrigo, a married man, and the father, by a former marriage, of a daughter about the same age as Elizabeth Tongue, first made the acquaintance of Elizabeth, a high school girl, while she was taking part in an amateur revue, called Kidnite Follies, at the Orpheum Theater, during the holidays of 1930. He was leader of the Orpheum orchestra. The evidence discloses that in January, 1931, he arranged for her to sort the music for the orchestra and file it away in alphabetical order and typewrite some of the titles on the outside, in his private rooms far up under the roof of the Orpheum Theater for two hours each evening. For spending this two hours sorting his music, he paid her $5 a week. She was never an employee of the theater company. He gradually won her entire confidence. At first the time she spent in his rooms was from 6:30 to 8:30 in the evening, and her stepmother testified she would reach home before 9 o'clock, and that she always kept her supper warm for her. After some months she would often come home much later, and several times the stepmother observed that

Perrigo brought her home in his car, and would park awhile a short way from their home, and finally one night they reached her home at 1:30 in the morning. Her father, who always waited up, went out to the car and found them in the car with their arms around each other, and upbraided them, and said: "She is not going to work at your office after tonight." Perrigo, in the heated conversation between the three, as testified by her father, said: "Well, there is no use exploding about it, * * * we settled all this last April, * * * we understand each other." Finally Perrigo, according to the testimony of her father, attempted to close the argument by brazenly saying to him, "And don't you say no more to me, the damage is already done." Her father took her in the house, and he testified that she told him the entire story.

The jury would have been justified in finding from the plaintiff's evidence, together with the facts which might reasonably be inferred therefrom, that Perrigo began to have intercourse with her in April after employing her in January; that, as a result, she contracted gonorrhea from Perrigo, and died from acute ulcerative endocarditis from the gonorrheal infection spreading to her blood stream.

The motion of the defendant for a directed verdict at the close of the plaintiff's evidence must be treated as an admission of the truth of all material and relevant evidence admitted favorable to plaintiff, and all proper inferences to be drawn therefrom.

The terms "inference," "probability," and "presumption" have substantially the same meaning. When one fact is proved, another, its uniform concomitant, is universally and safely presumed. Many inferences may be considered conclusive when they have been found to be general and uniform.

The inference which the jury are entitled to draw from the evidence is a permissible deduction or conclusion which is founded on common experience, and which natural reason draws from the facts which are proved. 10 R. C. L. 867, sec. 10; *Puget Sound Electric Ry. v. Benson*, 253 Fed. 710;

*Glowacki v. Northwestern Ohio R. & P. Co.*, 116 Ohio St. 451, 157 N. E. 21.

In *Perry v. Johnson Fruit Co.*, 123 Neb. 558, 243 N. W. 655, this court held: "In a civil action, when a fact may be fairly and reasonably inferred from other and all the facts and circumstances proved, it may be taken as established."

When the defendant makes a motion for a directed verdict at the close of the plaintiff's evidence, the trial court must assume the existence of every material fact which the plaintiff's evidence tends to establish, and, in addition, give to the plaintiff the benefit of all logical deductions therefrom.

In *Bainter v. Appel*, 124 Neb. 40, 245 N. W. 16, this court said: "If there be any testimony before the jury by which a finding in favor of the party on whom rests the burden of proof can be upheld, the court is not at liberty to disregard it and direct a verdict against him." So the trial court is not justified in withdrawing a case from a jury if there is competent evidence from which the alleged facts may be reasonably inferred. *Wheeler v. Abbott*, 89 Neb. 455, 131 N. W. 942; *Oleson v. Oleson*, 90 Neb. 738, 134 N. W. 648; *Curtice Co. v. Estate of Jones*, 111 Neb. 166, 195 N. W. 930; *Rhoads v. Columbia Fire Underwriters Agency*, 128 Neb. 710, 260 N. W. 174; *Weiner v. Aetna Ins. Co.*, 127 Neb. 572, 256 N. W. 71.

In my opinion it was error for the trial court to withdraw this case from the jury upon motion of the defendant for a directed verdict. Under the evidence of the plaintiff, in my opinion this case should have been submitted to the jury, and not arbitrarily dismissed by the court.