HAZEL SUHR, ADMINISTRATRIX, APPELLEE, V. HARRY LIN-
DELL ET AL., APPELLANTS.

277 N. W. 381

FILED JANUARY 27, 1938. No. 30152.

*Courtright, Sidner, Lee & Gunderson* and *L. R. Doyle,* for appellants.

*Robins & Yost, contra.*

Heard before GOSS, C. J., EBERLY, DAY, PAINE, CARTER and MESSMORE, JJ., and MUNDAY, District Judge.

MESSMORE, J.

This is an appeal from the district court for Dodge county, wherein a jury awarded plaintiff damages on two causes of action: $6,000 on the first cause of action for pain and suffering endured by plaintiff's husband, and $8,000 on the second cause of action for pecuniary damages for the benefit of plaintiff and her minor children.

Plaintiff's petition alleged certain damages growing out of an automobile accident, which occurred on June 2, 1936, on a highway in the suburbs of Fremont, Nebraska. The defendants' answer denied negligence and pleaded specific acts of negligence on the part of Martin Suhr, the deceased. Plaintiff replied by a general denial.

Richard Groene, driver of defendant Lindell's truck, which was an International two-ton truck, with dual wheels, licensed for full capacity, testified, in substance, as follows: He left West Point, Nebraska, about 6:30 p. m., collected some nine head of cattle, loaded them and came into Fremont on highway No. 8 from the north, and took U. S. highway No. 30 down to a place known as the Farris filling station, arriving there at 10:30 p. m., and remaining for about ten minutes; then proceeded east on No. 30 to Bell street, which is the new paving south of Fremont, 20 feet in width and apparently level for some distance. Groene then proceeded on his way south on Bell street. The dimmer lights on his truck were on, and he could see approximately 20 to 30 feet ahead.

Joe Sebek, driver of a truck, testified, in substance, that he and Joe R. Vesely arrived at the Farris filling station just as defendant Groene was leaving, and that they subsequently followed his truck within a range of 100 to 250

feet. The speed of both trucks was from 20 to 22 miles an hour. The Groene truck was proceeding on its right side of the highway and at all times remained on the right side. A Ford truck, driven by Martin Suhr, in the employ of a nursery company, was proceeding north on Bell street on his right side of the road. Sebek testified that he could see the lights of the Ford truck a block or two away before the accident occurred, and that, just as it was passing Groene's truck, "he (Suhr) just turned right under it;" "went in under his (Groene's) truck and come out and went behind" the Groene truck, and stopped on the west side of the highway between the Groene truck and the Sebek truck; that Suhr "had his arm pretty near gone;" that Suhr said "his arm was gone;" that his arm was not hanging out of the door of the Ford truck, and the window of the Ford truck was open; the left front tire was blown out at the time of the accident, and the lights on the Groene truck, both front and rear, were on; that the Groene truck at no time swayed in the road.

The witness Vesely, who was riding on the right side of Sebek, testified, in substance, that the Ford truck hit the Groene truck and he heard the tire blow out; saw the "sparks fly from the pavement;" that after striking the Groene truck the Ford truck came to the right side of the road in front of the Sebek truck. Witness did not see the Ford truck until it was about 60 feet distant therefrom, and stated that the Groene truck remained on its side of the road at all times. On cross-examination both Sebek and Vesely testified that they saw the lights of the Ford truck turn sharply to the left into the Groene truck. They made a statement to plaintiff's counsel, which is substantially the story told by them at the trial, with the exception that Sebek denied that the following was a part of the statement which he signed: All of a sudden the small truck hit into the International truck "right at the front corner of the rack;" "I didn't notice the lights on the International before or after the accident." There also appears in the statement referred to the following: The

driver of the International truck said: "It came so fast he didn't know how it happened."

Defendant Groene testified further that he first saw the lights of the Ford truck three or four blocks distant; that the Ford truck came down on its own side of the road in a straight line, and he could see it approaching 30 to 40 feet ahead of his truck; that the lights obscured his vision of the road; that the Ford truck seemed to switch right off into the left side of his truck "right under the wheels," "right under the box." He also testified that the Ford truck went over to the east side of the paving 30 or 40 feet ahead of him. There is evidence that both trucks were moved after the accident to permit traffic to pass. There is also evidence of pieces of glass having been swept from the east side of the highway. This glass was obviously from the lamp of the Ford truck. The evidence further discloses that immediately after the accident an ambulance arrived; Martin Suhr was taken to the operating room of a hospital in Fremont, where there were present Doctor Fasser, Paul K. Peterson, and his wife, Edith, a trained nurse, who managed the hospital.

The physical facts show that the rack of the Groene truck was about 7 feet, 9 inches, in width, the exact measurements not disclosed by the record; that the truck was approximately 13 feet in length; that the body of the truck extended beyond the cab on each side. The distance from the bottom of the rack to the ground is not disclosed. The front of the rack apparently was not struck by the Ford truck, but on the second stanchion, about the width of two boards up, appeared a chipped place. There is a dispute as to whether there were any marks on the first stanchion of the truck. There is some evidence that a piece had been gouged out of the first stanchion on the left side of the truck. There were pieces of flesh and clothing caught on the rack, back about two-thirds of the way from the front, and a little piece of skin and cloth had fallen to the floor of the rack. There were marks on the side of the rack, underneath the rack, and on the out-

side of the wheels. The back part of the International truck was lower than the front part. The Ford truck showed the left fender smashed, the rear-vision mirror bent back in towards the cab, the left front light broken, the metal water trough above the door was bent flat against the body of the truck, and the body was dented, both in front and behind, above the door. The rear left fender of the truck was dented, the door was closed, and the window on the left side was down.

Appellants contend that the physical facts demonstrate that the Ford truck turned into the defendants' truck; while appellee contends that the driver of defendants' truck was on the wrong side of the highway; that the front of the body of defendants' truck was higher than the rear and went over the left front fender of the Ford truck; that the front corner of defendants' truck rack hit the upper hinge of the cab door of the Ford truck; that the front side of defendants' truck hit the side of the Ford truck, thus drawing the front of that truck slightly to the left; that its left wheels went on by and under the edge of defendants' truck; in other words, the trucks sideswiped.

Appellants contend that the court erred in not sustaining defendants' motion for a directed verdict at the close of the testimony, citing *Hessler v. Bellamy,* 128 Neb. 571, 259 N. W. 514, wherein this court held: "If the evidence essential to a recovery by plaintiff is clearly disproved by the physical facts and conditions, the trial court should direct a verdict against him." *Dodds v. Omaha & C. B. Street R. Co.,* 104 Neb. 692, 178 N. W. 258, and *Sippel v. Missouri P. R. Co.,* 102 Neb. 597, 168 N. W. 356, holding to like effect are cited.

Appellants cite *Bentley v. Hoagland,* 94 Neb. 442, 143 N. W. 465, wherein this court held: "Where the verdict of a jury is clearly against the weight and reasonableness of the evidence, it will be set aside and a new trial granted." They also cite *Calnon v. Fidelity Phenix Fire Ins. Co.,* 114 Neb. 53, 205 N. W. 942, holding to like effect.

From the physical facts in this case, the jury could determine either that the Ford truck struck defendants' truck, or that defendants' truck and the Ford truck sideswiped.

Appellants cite *Anderson v. Altschuler*, 125 Neb. 853, 252 N. W. 310, wherein we held: "Where, in an action for damages, the evidence discloses certain physical facts which stand undisputed, and where the facts in evidence show beyond reasonable dispute that plaintiff's negligence was more than slight as compared with the negligence of defendant, and to such extent that no reasonable mind can believe that such contributory negligence on the part of the party injured was slight and the negligence, if any, of the defendant gross in comparison therewith, in such a case the jury should be instructed to find for the defendant."

The physical facts in the instant case do not meet the rule as announced in the above case, for the reason that the physical facts do not disclose or show beyond reasonable dispute that Martin Suhr's negligence was more than slight as compared with the negligence of defendant Groene. The defendants' witnesses, Sebek and Vesely, saw the Ford truck approaching, testified to its striking the Groene truck, but predicated their testimony on seeing the lights of the Ford truck suddenly veer to the left. The accident occurred in the nighttime. Defendant Groene's testimony that his vision was obscured immediately before the accident, and his statement to Sebek that "he could not do anything but let him hit him, said it came so fast he didn't know how it happened," and the fact that the Ford truck was traveling at the rate of 15 miles an hour, would leave the question as to the degree of negligence in dispute.

The appellants further contend that the court erred in not submitting to the jury the issue of contributory negligence on the part of Martin Suhr in driving with his arm out of the truck window. There is no evidence in the record that would warrant the trial court in giving such an instruction.

"It is proper practice for court to refuse to submit to jury defense not supported by evidence." *Sterns v. Hellerich,* 130 Neb. 251, 264 N. W. 677; followed in *Kovar v. Beckius, ante,* p. 487, 275 N. W. 670.

Appellants criticize instruction No. 6, given by the trial court, wherein the court used the word "cautious," together with the word "prudent," in defining negligence. "Cautious" is synonymous with "prudent." It may have been superfluous in the instruction, but its use was not error.

Instruction No. 8 is also criticized for the reason that it left the impression with the jury that they could consider any and all acts of negligence on the part of Groene at the scene of the accident. It is contended that the instruction throws the whole matter of negligence open to wild conjecture, and in the use of the words, "in any wise negligent," the jury could speculate without limit on the negligence of Groene, if any. In reading, in connection with instruction No. 8, instruction No. 9 on proximate cause, wherein the court did limit the negligence of Groene, if any, to the propositions of negligence as set out in instruction No. 1, and in reading instruction No. 1, which is also criticized, we conclude that instruction No. 1 sets out specifically the acts of negligence, if any, of which Groene would be guilty, and eliminates, for lack of evidence, from the jury's consideration several acts of negligence pleaded in the petition.

"Instructions given to a jury must be construed together, and if, when considered as a whole, they properly state the law, it is sufficient." *Clausen v. Johnson,* 124 Neb. 280, 246 N. W. 458; followed in *Kovar v. Beckius, supra.*

Appellants contend that certain statements made by Martin Suhr after the accident were improperly admitted and were not part of the *res gestæ.* In this connection it would be well to ascertain the physical condition of Suhr immediately after the accident. His left arm was practically torn off; he was suffering from loss of blood and shock and was cold. All of his muscles and soft parts of his left

arm were torn in the region of the elbow, and his arm from the elbow down was attached to the upper arm simply by a few shreds of muscle. The bones above the elbow were crushed in small pieces, and the skin was torn from the arm up above the shoulder. He had a cut about three inches long on his forehead and another cut about two inches long on his chin. He was given a hypodermic of morphine to ease his pain. There was clothing ground into his torn arm, and he was given glucose of normal salt under his skin as a stimulant.

Doctor Fasser testified that he asked Martin Suhr: "Slim, what happened to you?" and that, in response to this question, "He said that he had been struck by an automobile on the wrong side." This statement was made about 10:45 p. m. Paul K. Peterson understood the statement as follows: "He said it was over the black line in the center of the road. * * * Q. What did he say in reference to the black line? A. All that I could remember was that he looked up and saw this car. It was on his side of the road over the black line over on his side of the road." Edith Peterson, who was present at the time the statement was made, recalled it as follows: "He said, 'I was hit, crowded off by a car on the wrong side of the road.'"

"To bring acts and declarations within the doctrine of res gestæ, they must be connected with, and grow out of, the act or transaction which is the subject-matter of inquiry so as to form one continuous transaction, and must, in some way, illustrate, elucidate, qualify, or characterize the act, and, in a legal sense, be a part of it." 10 R. C. L. 977, sec. 160.

"A statement to be admissible as a part of the res gestæ must have been spontaneous and impulsive, and made at a time and under such circumstances as to induce the belief that it was not the result of reflection and premeditation." *Tongue v. Perrigo,* 130 Neb. 564, 265 N. W. 737.

"The consensus of the authorities seems to be that a declaration to be a part of the res gestæ need not be coincident in point of time with the main fact proved. It is

enough that the two are so clearly connected that the declaration can, in the ordinary course of affairs, be said to be a spontaneous explanation of the real cause. The declaration is then a verbal act, and may well be said to be a part of the main fact or transaction. Again, if the subsequent declaration and the main fact at issue taken together form a continuous transaction, then the declaration is admissible." *Missouri P. R. Co. v. Baier*, 37 Neb. 235, 55 N. W. 913.

"Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts." 3 Wigmore, Evidence (2d ed.) 738, sec. 1747.

" 'The trial court must be permitted to exercise its discretion, very largely, in determining whether the declarations were made under such circumstances as to permit the inference that they were genuine expressions, and the jury must be left to determine whether or not such inference shall be drawn.' *Hewitt v. Eisenbart*, 36 Neb. 794." *Ridenour v. Lewis*, 121 Neb. 823, 238 N. W. 745.

Considering the evidence relative to the condition of Martin Suhr immediately after the accident and the short period of time elapsing before the statement was made by him, as hereinbefore set out, we believe that the court properly admitted such evidence as part of the *res gestæ*.

A short time subsequent to the making of the foregoing statement by Martin Suhr he made a statement to Earl Conrad, his employer and owner of the Ford truck damaged in the accident. Conrad testified as follows: "Q. Now you may state what Martin Suhr said there in your presence. A. I just spoke to him and said, 'You had a pretty bad accident;' and he said, 'Yes; but Conrad it wasn't my

fault. They were clear over on my side and I couldn't help it.'" This statement was admitted in evidence as part of the *res gestæ*.

Obviously, the statement made by Martin Suhr to his employer, whose property had been damaged while he, Suhr, was driving, from its very nature, indicates that it was a statement made to his employer as to how the accident occurred and his reason why he was not to blame. We believe that this statement made by Martin Suhr to Earl Conrad was improperly admitted in evidence, and that its admission was prejudicial to defendants. There were also admitted in evidence certain statements made by Martin Suhr to different persons during the period he was in the hospital; his arm having been amputated at noon of the second day, and he having died on the third day, or approximately 36 hours after he had been taken to the hospital. These statements are as follows: "I will never live through this or get over this;" "I will never live through this, never;" and to Edith Peterson, who was present in his room almost hourly, he made such statements as "I will not live through this; I will never get over this and this is the end of me," saying that he was "going to die." Such statements of the declarant relating to his physical condition and his settled belief that he would not recover are not admissible in evidence as a part of the *res gestæ* and constitute merely an opinion of the declarant.

The statements, as hereinbefore set out, develop only one thing: That the patient believed he would not get well, do not relate to the accident or its cause, and are not spontaneous but reflect what the patient believed in his mind as to his condition. We believe such statements were inadmissible and prejudicial.

For the reasons given, the judgment of the district court is reversed, and the cause remanded for a new trial.

REVERSED.

CARTER, J., dissenting.

I am unable to agree with the holding of the majority opinion that the statement made in response to the inquiry by Dr. Fasser is admissible as a part of the *res gestæ.*

The record discloses that the accident happened between 10:30 and 11 o'clock p. m., and that it was 15 or 20 minutes before Mr. Suhr was removed from the scene of the accident. Upon his arrival at the hospital, in the words of one of the witnesses, "We worked with him for awhile getting him warmed up and sort of over his first shock" before the statement was made. It is apparent that at least 30 minutes had elapsed, and probably more, before Dr. Fasser made his inquiry. The evidence is not disputed that deceased was conscious from the time of the accident until the purported *res gestæ* statement was made. He talked with some of the witnesses immediately following the collision but made no statements bearing upon the cause of the accident at that time. Under this statement of the facts, the testimony offered in evidence is not a part of the *res gestæ.* It is merely a self-serving declaration that is not admissible in evidence for any purpose.

In order for a declaration to be admissible as a part of the *res gestæ,* it must be a spontaneous utterance, made contemporaneously with the facts in controversy and explanatory of such facts. A mere narrative of a past occurrence is not a part of the *res gestæ.* In the case at bar, the declaration was no part of the transaction. The accident had occurred more than 30 minutes before the declaration was made. Ample time had been afforded the declarant to formulate his thoughts and to engage in the natural tendency of a person to exculpate himself. The general rule is that the declarations of the party to his physician or to other persons as to the cause of the injury are not admissible when not made at the time of the injury. 3 Jones, Commentaries on Evidence (2d ed.) sec. 1217.

Another noted text-writer states the rule as follows: "The utterance must have been *before there has been time*

*to contrive and misrepresent,* i. e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance. * * * It is to be observed that the statements *need not be strictly contemporaneous* with the exciting cause; they may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and to be dissipated." 3 Wigmore, Evidence, sec. 1750 (b).

In commenting on the same point, another text-writer states: "So if in one of our streets there is an unexpected collision between two men, entire strangers to each other, then the *res gestæ* of the collision are confined within the few moments that it occupies. * * * It is the power of perception unmodified by recollection that is appealed to; not of recollection modifying perception. Whenever recollection comes in—whenever there is an opportunity for reflection and explanations—then statements cease to be part of the *res gestæ.*" 1 Wharton, Law of Evidence (3d ed.) secs. 258, 259.

In *Chicago & A. R. Co. v. Industrial Board,* 274 Ill. 336, 113 N. E. 629, the court said: "Declarations by an injured person to his attending physician are admissible in evidence when they relate to the part of his body injured, his suffering, symptoms and the like, but not if they relate to the cause of the injury; and this rule is even more rigorously enforced as applied to lay witnesses."

In *Chicago Packing Co. v. Industrial Board,* 282 Ill. 497, 118 N. E. 727, the court said: "Where no one witnesses an accident resulting in an employee's death, the testimony of an interne at the hospital to which the injured employee was taken, as to what the employee told him about the accident, is not admissible."

In *Roosa v. Boston Loan Co.,* 132 Mass. 439, the court said: "While a witness, not an expert, can testify only to such exclamations and complaints as indicate present existing pain and suffering, a physician may testify to a statement or narrative given by his patient in relation to his condition, symptoms, sensations, and feelings, both

past and present. In both cases these declarations are admitted from necessity, because in this way only can the bodily condition of the party, who is the subject of the injury, and who seeks to obtain damages, be ascertained. But the necessity does not extend to declarations by the party as to the cause of the injury, which is the principal subject-matter of inquiry, and which may be proved by other evidence. No case has been called to our attention, and we are not aware of any case, where such evidence has been admitted."

In *Fordyce v. McCants*, 51 Ark. 509, 11 S. W. 694, a physician was permitted to testify that, after driving 13 miles to attend the deceased who had been injured in a railroad accident, deceased stated to him that he had been thrown heavily across the corner of a seat and had thus received an injury from which the witness found him suffering. The court held that such declarations were not part of the *res gestæ*.

In *Illinois Central R. Co. v. Sutton*, 42 Ill. 438, the court used the following language: "But to permit a party to prove what he himself stated to his physician, not in regard to the character and manifestations of his malady, but in reference to its specific cause, when that is one of the issues before the jury, would be carrying an acknowledged departure from the ordinary rules of evidence, having its origin in necessity, to a most dangerous extent."

In *Mayes v. State*, 64 Miss. 329, 1 So. 733, the rule is stated in the following language: "It is not enough that the statement will throw light upon the transaction under investigation, nor that it was made so soon after the occurrence as to exclude the presumption that it has been fabricated, nor that it was made under such circumstances as to compel the conviction of its truth; the true inquiry, according to all the authorities, is whether the declaration is a verbal act, illustrating, explaining, or interpreting other parts of the transaction of which it is itself a part, or is merely a history or a part of a history of a completed past affair. In the one case it is competent, in the other it is not."

In *Simon v. Dixie Greyhound Lines,* 176 So. (Miss.) 160, a case very similar to the one at bar, the witness was in bed when he heard the crash of the collision. He immediately dressed and hurried to the scene of the accident. He assisted in carrying the injured man up the embankment onto the road and the witness offered to testify that the injured man said, "How come me here?" and next said, "The lights blinded me, I couldn't see, I tried to stop and couldn't." He further testified that the injured man stated that he thought the bus was coming, and that he turned gradually to the right until he got on the bank and then could not stop. The court held that the statements by the injured man *at the scene of the accident* constituted a mere history or narrative of a completed past occurrence, and were therefore not admissible as a part of the *res gestæ.*

In *Zohner v. Sierra Nevada Life & Casualty Co.,* 114 Cal. App. 85, 299 Pac. 749, the evidence showed without conflict that the deceased was unconscious for something in excess of five minutes after the accident. The court said: "It is claimed that the trial court erred in admitting a certain declaration of the deceased made after regaining consciousness to the effect that he turned out to avoid striking another car. This testimony was inadmissible (citing cases)."

In the last two cited cases, if the declarations made had been spontaneous and explanatory of the accident, I would not agree with the result. They appear to be merely a recital of a past event; they are nothing more than self-serving declarations that are not admissible even if a part of the *res gestæ* in point of time.

In *Hill v. Aetna Life Ins. Co.,* 150 N. Car. 1, 63 S. E. 124, the court said: "The defendant proved by a witness that just after a passenger train running twenty-five to thirty miles an hour had passed, he saw the deceased struggling and falling along beside the train; that witness ran there as quickly as he could, rolled the man over on his face and commenced to talk to him. The court properly excluded any evidence as to what the injured man stated as to how he had sustained the injury. Though the time which had

elapsed was brief, the conversation was not a part of the *res gestæ. It was not exclamatory but narrative,* and therefore hearsay and incompetent. * * * The evidence offered of declarations made a few minutes still later by the deceased as to the manner in which he had been injured were, of course, incompetent. The fact that the plaintiff had repeated one of these statements made to himself did not make it competent. It was merely hearsay still." (Italics ours.)

Some of the cases in this court supporting my contention are: *Missouri P. R. Co. v. Baier,* 37 Neb. 235, 55 N. W. 913; *Union P. R. Co. v. Elliott,* 54 Neb. 299, 74 N. W. 627; *City of Lexington v. Fleharty,* 74 Neb. 626, 104 N. W. 1056; *Roh v. Opocensky,* 126 Neb. 518, 253 N. W. 680; *Milton v. City of Gordon,* 129 Neb. 888, 263 N. W. 208; *Tongue v. Perrigo,* 130 Neb. 564, 265 N. W. 737.

The decision most frequently relied upon to sustain the admission of the declarations of an injured person as to the cause of an injury that has resulted in his death is *Insurance Co. v. Mosley,* 8 Wall. (U. S.) 397, 19 L. Ed. 437, in which declarations of the deceased that he had fallen downstairs, made to his son immediately after the occurrence, and to his wife as soon as he came back upstairs, were admitted in evidence as part of the *res gestæ.* While this case has been severely criticized, I would not feel obliged to voice objection if the rule therein stated were applied to the suit at bar. The declarations in the *Mosley* case were spontaneous and immediate and justification exists for the statement that they were so close in point of time that they should be considered as a part of the whole transaction. This is not so in the case before us.

I submit that the declarations in the instant case were not a part of the accident nor did they follow immediately upon the happening of the accident. They were narrative in form and consisted merely of a recital of a past transaction that had terminated more than 30 minutes before; the opportunity for reflection and self-exculpation was present and the declarations were in no sense spontaneous,

they having been elicited by the inquiries of the physician, and were not voluntary declarations in the sense required by the *res gestæ* rule. In my judgment, the decision of the majority is an unjustifiable departure from the rules announced by this court and the courts of other jurisdictions. It must ever be borne in mind that "what the law distrusts is not after speech, but after thought."