MARGARET MACKECHNIE, APPELLEE, v. OSCAR LYDERS ET AL.,
APPELLANTS.

279 N. W. 328

FILED APRIL 29, 1938.   No. 30250.

*Baylor, Tou Velle & Healey* and *Courtright, Sidner, Lee & Gunderson,* for appellants.

*Stiner, Boslaugh & Stiner, Robins & Yost* and *Butler & James, contra.*

Heard before GOSS, C. J., ROSE, EBERLY, DAY, PAINE, CARTER and MESSMORE, JJ.

MESSMORE, J.

This is an appeal from the district court for Dodge county in a law action to recover damages for personal injuries on account of defendants' negligence. The jury returned a verdict for the plaintiff, and from such verdict defendants have appealed.

Plaintiff's petition alleges ownership of the bus in defendant Lyders, the occurrence of the accident, the driving of the bus by defendant Lyman as an employee of defendant Lyders, and alleges certain acts of negligence on the part of Lyman, the injuries sustained by plaintiff, and prays for damages. The answer of defendant Lyders admits the occurrence of the accident; that the plaintiff sustained injuries; alleges certain affirmative acts of contributory negligence on the part of the plaintiff, and denies ownership of the bus in Lyders. The answer of defendant Lyman is to the same effect. Both answers deny negligence on the part of defendants. The reply is, in substance, a general denial of defendants' answers.

The evidence discloses that Professor Lyders was the head of the music department of Midland College, Fremont, Nebraska; that defendant Lyman was a student in such college, and the plaintiff was an employee of the college, being an assistant to Professor Lyders. In April, 1936, a trip was planned to transport the acappella choir, consisting of 65 members, by two automobiles and two busses through certain parts of the state of Texas on a concert tour. On April 19, 1936, the choir had given a concert at Fort Worth, Texas, and was about to give another concert at Denton, Texas, approximately 35 miles distant, at 8 o'clock on the same evening. To be present in Denton for the concert required some haste on the part of the members of the choir. The 1928 Studebaker bus, in which the plaintiff was riding and which defendant Lyman was driving at the time of the accident, left Fort Worth about 5:30 p. m. When midway between Fort Worth and Denton, and when the driver of the bus was about to negotiate a curve on an oiled road, the right wheels of the bus followed the

right shoulder of the road across and over a ditch and into a field where the bus circled and was stopped. Plaintiff fell from the rear door of the bus and was injured. The facts will be more specifically covered in this opinion in relation to certain assignments of error, to which such facts as may be necessary will be applied.

The first four assignments of error are as to the insufficiency of the evidence to support the verdict; that the verdict is contrary to law, and that the separate motions of defendants for a directed verdict should have been sustained by the trial court.

The ownership of the bus in Lyders is questioned by defendants. The pertinent facts relating to this question follow: There had been some discussion between Lyders and Doctor Martin, the head of Midland College, relative to transportation of the choir and athletic teams of the college to and from different points, and that the hiring of transportation created too much expense on the part of the college. Lyders discovered the 1928 Studebaker bus, involved in this action, in the city of Omaha, took up the matter of purchasing it with Doctor Martin, and both agreed that it was a bargain at the price offered. Doctor Martin, however, stated, in substance, that the college did not have sufficient funds with which to buy the bus; that if Lyders would assume full responsibility for the purchase any profits made from the trips would be used to reimburse Lyders for the moneys expended. Thereafter Lyders purchased the bus, paying for it personally. He borrowed the money from the Fremont State Company, and gave a chattel mortgage on the bus to that company for the loan.

January 21, 1935, the original motor vehicle license, issued to Smith Robinson Motor Company, from whom Lyders purchased the bus, was transferred on the transfer record on the back of the original certificate to Lyders, and signed by Smith Robinson Motor Company of Omaha. Plaintiff's exhibit Y (defendants' exhibit 6) is an affidavit signed by Oscar Lyders and sworn to before a notary public on April 2, 1936, wherein he states that he is the

owner of the bus and petitions the treasurer of Dodge
county to issue a license to "Midland College / Oscar Ly-
ders." The transfer record shows a transfer to Oscar
Lyders, and a bill of sale on a regular state of Nebraska
form for the transfer of motor vehicles was issued to
Oscar Lyders, sworn to before a notary public on January
21, 1935, and contained in the bill of sale were the words
"has sold and transferred to Oscar Lyders." Subsequently,
on January 23, in the same bill of sale appears "Midland
College Choir, Oscar Lyders, Mgr.," which is also sworn
to before a notary public. The county treasurer of Dodge
county on January 23, 1935, issued a motor vehicle license
covering the Studebaker bus to Oscar Lyders. The regis-
tration fee was paid by Oscar Lyders in the amount of $15.
On April 16, 1935, a readjustment was made on the cer-
tificate and the sum of $3 was returned. This certificate
reads in part: "This certifies that Midland College / Oscar
Lyders * * * has registered as owner." A bus owned by an
individual and used for transportation requires a higher
registration fee than a bus used by a college or school. The
state department had returned to the county treasurer
the certificate for collection of the additional, or correct,
amount, which was the reason for the showing of Midland
College on the certificate. This required an expenditure of
$12. April 2, 1936, there was a license or certificate issued
reading "This certifies that Midland College / Oscar Ly-
ders of Fremont," etc. There was no bill of sale of any
kind showing the transfer of this property from Oscar
Lyders to Midland College of record or filed with the county
treasurer, as provided for by law. The registrations were
made and paid for by Lyders; whatever personal tax as-
sessed was paid for by him. Lyders individually executed
a chattel mortgage to the Fremont State Company on the
Studebaker bus, of record in the office of the county clerk,
March 30, 1936. This mortgage was made for the purpose
of financing the International bus, a second bus, and it is
claimed that Doctor Martin and Mr. Lyders executed the
note secured by the mortgage. The note is not in the

record. The mortgage was signed by Oscar Lyders. At the time of the purchase of the Studebaker bus a chattel mortgage for $275 to the Fremont State Company was filed of record, signed by Oscar Lyders. On September 26, 1936, a chattel mortgage was executed by Oscar Lyders, which included the Studebaker bus. Repairs were made on the Studebaker bus in the amount of $260 which were paid for by Lyders, and subsequent to the New York trip in 1936 there was a general overhauling of the bus, with a new motor and several other mechanical changes being made, requiring an expenditure of $233, paid by Lyders.

The appellants contend that Lyders was the agent of the college, and that the Studebaker bus was purchased for the college, used in its service, and that Lyders had the overseeing of the bus; that he had given a bill of sale for the bus April 15, 1935, and that the registration for the license for the bus discloses that the mark "/" meant "by" and therefore at no time did the registration disclose Lyders as the true owner of the bus. The bill of sale, as testified to by Lyders, was to put the ownership of the property where it belonged. This bill of sale was never filed of record, nor was it filed with the county treasurer of Dodge county as evidence of ownership in the college.

The college musical organizations netted $750 from a successful tour of New York state, the money being used to reimburse Lyders and extinguish the indebtedness on the busses. The Studebaker bus was painted an orange color, advertised the name of the college and the choir, and had on it other college insignia.

In the case of Myers v. McMaken, 133 Neb. 524, 276 N. W. 167, it was held: "In an action for damages growing out of a collision between an automobile and a truck, evidence that the name of defendant was on the sides of the truck raises a presumption that the truck belonged to defendant." In the instant case, while this presumption was in favor of the defendants, there was evidence to rebut it. It is not conclusive of ownership, but a fact for the jury's consideration in determining the question of ownership,

together with all the other evidence touching upon such question.

On the foregoing facts, the question of ownership of the bus was submitted to the jury, placing the burden on the plaintiff to prove that Lyders owned the bus.

This court held in *In re Estate of Wroth*, 125 Neb. 832, 252 N. W. 322: "Title to automobile can be transferred between living persons only by compliance with sections 60-310 and 60-325, Comp. St. 1929, relative to such transfer."

Section 60-310, Comp. St. 1929, in part provides: "Upon the transfer of ownership of any motor vehicle, its registration shall expire, and the person to whom ownership of such vehicle is registered, and the person to whom ownership of such vehicle is to be transferred, shall forthwith join in a statement of said transfer, indorsed upon the reverse side of the certificate of registration of said motor vehicle, in the space provided for said purpose, which statement shall be signed by the transferer in the manner and form of his signature, contained on the face of said certificate, and which statement shall likewise be signed by the transferee, who shall set forth, below his signature, his postoffice address." And section 60-325, Comp. St. 1929, contains this proviso: "Provided, upon the transfer of ownership of any motor vehicle the title shall not pass until the certificate of registration properly executed, shall be filed in the department of public works as required in this article."

Under the facts in this case, the noncompliance of Midland College with the sections of the statute relating to transfer of automobiles is obvious. Suffice it to say that the question of ownership of the bus was presented to the jury, the facts in relation thereto being in controversy, and the defendants, under this evidence, are not in a position to complain, especially in view of our decision in *In re Estate of Wroth, supra*.

We are next confronted with the question of whether defendant Lyman was in the employ of defendant Lyders at the time of the accident. The burden of proof was placed

on the plaintiff to prove this relationship; that is, the relationship of master and servant.

The evidence develops that Lyman, 26 years of age, a student at Midland College for four years, had driven cars from the time he was 14 years old and had driven for the college on different trips; that Doctor Martin told him before he left that he would have to be chaperon to the persons conveyed in his bus. Lyders selected Lyman and had charge of the transportation of the choir *en tour*, traveled with the choir in his own car, paid Lyman personally 4 cents a mile for driving; Lyman was to pay for the gasoline and oil, and any amount over that was to be his. Lyders received 50 cents a mile for the use of the two cars and the two busses. The choir's treasurer paid Lyman some of the money due him; Lyders paid him personally some of the money due and settled with him at the conclusion of the trip. Lyman testified that he was in the employ of Midland College, and there is evidence to the effect that the money was allocated by Midland College for this transportation. *En tour* Lyman was under the direction of Lyders, and, as the testimony discloses, Lyders assumed the responsibility for the busses and for the tour. Lyders testified that he did not employ Lyman in his individual capacity to drive the bus; that he had the consent of Doctor Martin to employ him. Lyman testified that he and Lyders had talked about the trip but did not come to any definite agreement; that one time Doctor Martin stopped him when he was leaving the chapel and told him he had been selected as a driver; that he was not sure he was to be the driver of the Studebaker bus; that Lyders was having a meeting with Doctor Martin.

In the case of *Neff v. Brandeis*, 91 Neb. 11, 135 N. W. 232, it was held: "To sustain a recovery for injuries caused by being run down by an automobile owned by the defendant, the plaintiff must show by a preponderance of the evidence that the person in charge of the machine was the defendant's servant, and was, at the time of the accident, engaged in the master's business or pleasure with the

master's knowledge and direction." And in *Weber v. Thompson-Belden & Co.*, 105 Neb. 606, 181 N. W. 649, the above rule was stated.

"(1)  A master is a principal who employs another to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service.

"(2)  A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master." Restatement, Agency, 11, sec. 2.

"To constitute the relationship of master and servant, the one for whom the service is rendered must consent or manifest his consent to receive the services as a master." Restatement, Agency, 490, sec. 221.

Having in mind the foregoing principles of law announced, and analyzing the facts, we believe that the trial court was correct in submitting the issue of employment of Lyman by Lyders to the jury.

The appellants complain that the trial court did not present to the jury certain elements of contributory negligence as pleaded in the answer of the defendants. The only issue submitted to the jury for the defendants in this behalf was the issue on speed of the automobile and the plaintiff's contributory negligence in that regard.

The bus was about 28 feet long and was capable of carrying 20 to 25 passengers. Plaintiff testified that when she entered the bus she was seated in the rear seat and on the left side. Four other members of the choir were seated beside her. Three people were seated in front of and looking towards her, with their backs to the front of the bus. She was approximately 20 feet from the driver. The first thing that challenged her attention was the swaying of the bus when it "started bumping up and down and we were thrown from side to side and up and down until we were just all mixed up." Plaintiff was thrown from the bus and went out backward. She testified that she would not be

in a position to observe the accident because she was in the rear of the bus, and she made no protest.

The appellants cite the law of Texas in *San Antonio Brewing Ass'n v. Wolfshohl*, 155 S. W. (Tex. Civ. App.) 644, as follows: "The doctrine of comparative negligence is applicable only to common carriers, being made so in that case by statute, and in every other case contributory negligence is an absolute defense, however negligent defendant may be."

Appellants cite 5 Am. Jur. 775, sec. 485, as follows: "It is the duty of a passenger to register protest against the excessive rate of speed of a car in which he is riding and to take such measures looking to his safety as may be expected of a reasonably prudent man under certain circumstances. For a failure to discharge his duty in this respect, he will be considered contributorily negligent."

In 5 Am. Jur. 771, sec. 478, it is said: "The place which a passenger occupies in an automobile is important in determining whether he exercised reasonable care and prudence to detect and warn against danger, for one on the front seat with the driver may have a far better opportunity of discovering any danger ahead in the path of the car than one in the back seat."

In *Sterns v. Hellerich*, 130 Neb. 251, 264 N. W. 677, it was held: "It is proper practice for court to refuse to submit to jury defense not supported by evidence." Followed in *Suhr v. Lindell*, 133 Neb. 856, 277 N. W. 381.

Instruction No. 10, given by the court, is criticized by appellants, in that the court did not qualify such instruction by telling the jury that plaintiff's right of recovery could have been defeated if the jury found from her testimony that she was guilty of contributory negligence. We believe this criticism is without merit. The record fails to disclose any evidence upon which contributory negligence could have been properly submitted to the jury. *Carlson v. Roberts*, 133 Neb. 166, 274 N. W. 473.

Appellants contend that the negligence, if any, of Lyman, the driver of the bus, was not the sole and proximate

cause of the accident and the injury sustained by the plaintiff. Defendants took the deposition of one T. M. Jones, who was called and testified for the plaintiff. He lived 300 yards from the scene of the accident and saw the accident happen. Six photographs, properly identified and showing the topography of the land, the condition of the highway and all things necessary and incident in the surrounding territory at the base of the curve, also a map, properly identified, with the respective distances shown for the jury's consideration, were all received in evidence. There was some question as to whether another automobile was proceeding from the north to south that crowded Lyman at the curve in the road. Jones saw the bus leave the highway. At that time he observed no other car. When the bus left the highway, this witness saw the dust commence to fly, saw the bus hit the ditch and careen, and saw the plaintiff fall from the bus. The driver kept on going, made a circle, and came to a stop.

Harold Livers, driver of the International bus which was *en tour* with the choir, testified as to their hurry to reach Denton, and the packing of the suit cases on top of the Studebaker bus, inside of an iron rail and tied down. Ordinarily, the robe box was placed, together with some suit cases, on top of the Studebaker bus. Witness had a conversation with Lyman in Denton after the accident, wherein Lyman said that he noticed that day in driving that the unusual amount of luggage seemed to cause the bus to sway more than was usual, especially on the curves, and he thought this had a good deal to do with his going into the ditch on the curve.

William Burklund, riding in the center of the bus, noticed the bus swerving and rocking from side to side and bouncing a bit; he had a conversation with Lyman as to the luggage on the bus; Lyman told him substantially as testified to by Livers. Ray Vopalensky, riding in the Studebaker bus beside the driver, observed the driver wrestling with the wheel to a greater extent than he had been, was looking down just prior to the accident, but the first thing he

noticed was when he "heard the fenders rubbing on the wheels which caused a lot of noise." Lyman cramped the wheel, had one foot on the foot feed and the other on the clutch when the bus was going into the ditch, traveling about 35 miles an hour.

Lyman testified that the baggage was loaded by a committee, appointed by Harold Livers, president and manager of the choir. The witness had nothing to do with the loading of the baggage at Fort Worth; did not observe the loading. On the day of the accident 24 bags or cases were loaded in the baggage rack of the Studebaker bus, packed in two canvas sacks and tied down on the roof with ropes. He testified that he may have stated to one of the counsel for appellee that the placing of the bags on the bus had made it top-heavy and hard to manage; that he did not believe that he would have had trouble on the curve except for that circumstance; that in the evening of the day of the accident he had told Mr. Burklund that the baggage on the roof might have been a factor, but that he told Burklund the accident was due to the fact that he had pulled out on the shoulder of the road to avoid colliding with a car; that the shoulder was soft and it was either a case of running into the ditch and tipping over or straightening up the bus by turning into the field; that he did not recall the conversation with Vopalensky; that he was driving the bus on federal highway No. 377, a paved highway 18 feet wide, with a painted strip in the middle, about 35 miles an hour; decreased his speed as he entered the curve to not more than 30 miles an hour. He observed the unpaved shoulder in the highway, and it appeared smooth and firm; that more gravel had been sprinkled on it. Before he came to the turn, he noticed a car coming down the hill at a considerable rate of speed, over 50 miles an hour, and expected it to slow up by the time it came to the curve. Witness pulled over to the right side of the road as he approached the curve, and the oncoming car failed to slow down as it neared the corner, and it was past the center of the road. As witness entered the curve the car was passing alongside

the bus. The position of the bus on reaching this point was to the right on its own side of the road. The right wheels of the bus got off of the shoulder and proceeded around or into the curve. When the bus got over the shoulder of the curve it was like running into a pile of loose gravel, pulling the bus towards the ditch. The plane of the shoulder was lower than the plane of the road. The bus leaned and swerved somewhat.

Witness further testified that he made an effort to pull the bus back on the pavement, but was unable to do so without running into the ditch. He drove the bus on the shoulder some two bus-lengths before he turned off the highway. He stated it happened so suddenly that he thought, on the spur of the moment, he must either run into the ditch or straighten the bus and run into the field. He did not want to stop in the ditch and have trouble pulling out the bus, so he traveled in the field, making a complete turn, and was met by cries of "stop;" that except for the cries he would have driven right onto the road. Before the accident witness noticed nothing unusual in the operation of the bus. When he first saw the automobile approaching he remarked to Miss Anderson, seated beside him: "Look at that crazy car." The automobile crowded the bus from the curve; witness stopped feeding gas to the motor before it left the highway, and started to circle back to the pavement. The bus would require a distance of 100 feet in which to stop from a speed of 30 miles an hour. Witness did not apply the brakes of the bus when he felt the wheels sinking into the shoulder, for the reason that he feared by doing so he would be confronted by a greater danger than if he let the bus travel in its natural momentum. The distance from the edge of the pavement to the far side of the ditch was 18 to 20 feet; the slope from the pavement to the top was a continuous, smooth slope; the field appeared to be a typical, smooth pasture. Upon returning to the pavement after the accident, he drove the bus through the ditch out to the same place where it had been on leaving the pavement. He observed the tracks left

by the bus during the time it left the highway and they were over six inches deep at the edge of the paving. On cross-examination he testified that he was probably going a little faster than 35 miles an hour; he saw the approaching car about a block and a half north of the gravel, traveling at an excessive rate of speed in the middle of the road. Other evidence shows that this distance was over 300 feet from the place at which the bus left the highway. Witness drove the bus off the paving across the shoulder, down the sloping grade into the ditch, which was about four feet deep, with an abrupt 18-inch rise on its farther side.

Alice Anderson, riding in the front seat of the bus, immediately at the right-hand side of the driver, Eleanor Bethke, seated directly behind him, June Beam, seated in the right center of the bus, A. L. Mendenhall, seated right inside of the front door of the bus on the right side, all substantiated the testimony of Lyman in most particulars. Eleanor Bethke fixed the speed of the bus at 40 to 45 miles an hour.

Both defendants moved for directed verdicts, which motions were overruled. In *Moncrief v. Interstate Transit Lines*, 129 Neb. 168, 261 N. W. 163, this court held: "A motion for a directed verdict must, for the purpose of a decision thereon, be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed, and said party is entitled to have every controverted fact resolved in his favor, and to have the benefit of every inference that can reasonably be deduced from the facts in evidence."

We believe that the facts in the instant case were in controversy as to whether or not the negligence, if any, of Lyman was a direct and proximate cause of the injury sustained by the plaintiff; that the jury were properly instructed in this respect, and that the instructions on this feature of the case given by the court on its own motion and requested instructions are adequate.

Appellants in assignment of error No. 6 complain of instruction No. 3, stating that, the court having introduced the doctrine of concurrent negligence, it became the fur-

ther duty of the court to inform the jury that before the defendants, or either of them, could be held liable under the doctrine, the evidence must show that the accident would not have happened but for the specific negligence of the defendants; that the acts of the unidentified motorist, of which there is some evidence, in forcing the driver Lyman to turn off the pavement, were independent, self-operating forces, disconnected from any acts or omissions of defendants, and were alone the proximate cause of the accident; that it was not enough for the court to inform the jury that any negligence of the defendants, in conjunction with negligence of another, forming the proximate cause, would create liability on the part of the defendant; that the doctrine applies only when the accident would not have occurred except for the existence of both forces.

Instruction No. 3 placed the burden on plaintiff to prove by a preponderance of the evidence paragraphs 3 and 4 of said instruction, as hereinafter set out. Paragraphs 1 and 2 of the instruction are not set out. Paragraphs 3 and 4 thereof follow:

"That the proximate cause of the accident and the injuries resulting therefrom, if any, was the negligence of the defendant John Lyman in one or more of the particulars alleged in the plaintiff's petition, and that such negligence was the proximate cause of the accident and the injuries sustained by the plaintiff therefrom, if any.

"Or that because of such negligence, if any, in conjunction with the acts of some third person not a party to the suit, as a proximate cause the accident occurred."

Requested instruction No. 2 by defendants and given by the court told the jury: "You are instructed that if from a preponderance of the evidence you find the sole proximate cause of the accident complained of by the plaintiff was the presence and action of a motor car driven by third and unknown persons then upon so finding your verdict must be for the defendants."

We believe, in view of the foregoing, that the court sufficiently covered the matters complained of by defendants and clearly and unequivocally told the jury that before the

defendants, or either of them, could be held liable, the evidence must show that the accident would not have happened but for the specific negligence of defendants.

Objection is made to instruction No. 11 given by the court. When this instruction is read and considered with instruction No. 3 and with all of the other instructions given, we believe that it is free from prejudicial error.

The appellants cite the case of *Belik v. Warsocki*, 126 Neb. 560, 253 N. W. 689, wherein we held: "Where one driving an automobile is suddenly confronted by an emergency, requiring instant decision, he is not necessarily guilty of negligence in pursuing a course which mature reflection or deliberate judgment might prove to be wrong." We believe that instruction No. 1, requested by defendant John Lyman and given by the court covers the situation contended for as to emergency, if the same existed.

Appellants cite *Wagner v. Watson Bros. Transfer Co.*, 128 Neb. 535, 259 N. W. 373, in which this court held: "It becomes the duty of the trial court to submit to the jury the necessary issues of fact presented by the pleadings and the evidence, whether requested or not, and a failure to do so constitutes error." They also cite other cases to like effect.

Appellants complain that the trial court failed to give qualifying instructions by setting forth in such instructions facts and circumstances showing ownership of the bus in defendant Lyders, or the employment of defendant Lyman. We believe that the jury had sufficient facts before them to determine these two matters; that the court, by not attempting to set forth facts in such instructions, conformed to the best practice, and that the instructions in this behalf are adequate.

Other instructions given by the trial court, instructions requested and given, and instructions not requested, have been examined, and we believe that the instructions given by the court, considered as a whole, properly state the applicable law and are sufficient. See *Holtz v. Plumer*, 133 Neb. 878, 277 N. W. 589.

AFFIRMED.