HELENA AMELIA HOPPER, APPELLANT, V. CLIFF T. KOENIG-STEIN, APPELLEE.

284 N. W. 346

FILED FEBRUARY 24, 1939.   No. 30447.

*Fay H. Pollock,* for appellant.

*Kennedy, Holland, De Lacy & Svoboda, contra.*

Heard before SIMMONS, C. J., ROSE, PAINE, CARTER, MESSMORE and JOHNSEN, JJ., and CHAPPELL, District Judge.

JOHNSEN, J.

The sole question involved is whether the death of Roy Hopper arose out of his employment, so as to entitle his widow to benefits under the workmen's compensation law. The compensation court dismissed her claim, and the district court, to which she appealed, similarly denied a recovery. She has appealed to this court.

Hopper was employed as a service man in the electrical refrigerating business operated by defendant at Norfolk, Nebraska. On June 24, 1936, he was sent to Stuart, Nebraska, to repair and adjust a beer cooling system, which he had installed about a month previously, in the tavern

or beer parlor of Carroll Eaton. He began work about 1:30 p. m. The condenser motor, located in the basement of the tavern, had burned out. It was removed and replaced with a larger motor. The refrigerating system then had to be balanced by adjusting the pressure and temperature control valves, so the beer would have proper foam content. The time usually required for the whole task was approximately four hours, although there is testimony that, under special conditions, it might take ten or twelve hours.

Irvin Kouba, the salesman who had sold Eaton the equipment, accompanied Hopper to Stuart and remained with him most of the time he was working in the basement. About 4:30 p. m. Kouba and Eaton decided to go fishing. Hopper still had to adjust the valves which controlled the amount of refrigerant going into the coils. These valves were located on the main floor of the beer parlor, two inside and one just outside the cooling compartment.

From that time on Hopper struck up an acquaintanceship with Floyd Denton, a polish salesman, who had come into the beer parlor during the afternoon. For about three and a half hours they fraternized and drank beer with each other. Witnesses describe them as talking, laughing and joking together. Hopper offered to buy drinks for two women who came into the tavern. The four seated themselves at a table, indulged in sociability, and consumed several rounds of beer. Denton undertook to sing, but was stopped by the tavern keeper. When the women had to leave, Denton invited them to return later. Denton's indulgences ultimately produced intoxication. There is no testimony that Hopper became intoxicated, and, on the autopsy performed a couple of hours after his death, no evidence of alcoholism was observed. It does appear, however, that he drank at least six or seven glasses of beer. Denton says they had forty or fifty glasses together, but his testimony is not worthy of much credence. He was an ex-convict, with a somewhat extensive criminal record.

Hopper apparently made some momentary adjustments of the temperature control valves during the course of his

companionship with Denton. Kouba, however, personally checked the thermometer, on his return from the fishing trip about 8:00 p. m., and asked Hopper to adjust the valves. Hopper did so and then returned to the bar where he was drinking with Denton. No further temperature adjustments were made or needed, although the caps or covers on the valves were not yet replaced. Within a few minutes thereafter, Denton struck Hopper with his fist, rupturing a blood vessel in the brain, and causing Hopper's immediate death.

Hopper was shown to have been a peaceable man, of good reputation and character. There was nothing in the conversation between him and Denton that had attracted the attention of the five or six other persons standing at the bar when the blow was struck. The record discloses no acceptable provocation, notwithstanding Denton sought to claim, in a deposition taken at the state penitentiary, where he was committed for Hopper's death, that Hopper had called him a vile name. At the time of his arrest he had made the following simple explanation to the village marshall: "I thought I would just bloody up his nose for him, and I hit him a crack." The assault, seemingly, was one of those expressions of resentment or assumed superiority which drunken men sometimes unloose toward those with whom they have been fraternizing.

The widow insists in this situation that she is entitled to compensation on the grounds, (1) that the assault was occasioned by the special risk to which Hopper's work in the beer parlor exposed him, and (2) that, even if the assault did not result from exposure to any special risk, Hopper's fraternizing and drinking with Denton were such reasonable and permissible incidents of his employment as to constitute part of the hazard of the industry.

The general rule is that, unless other controlling factors are involved, injury or death from assault occurring during the course of employment is compensable, (1) where the conditions of the employment expose the workman to the likelihood of such special risk, or (2) where there is an

immediate causal connection existing between the employment and the assault. 112 A. L. R. 1262; annotation.

The case of *Socha v. Cudahy Packing Co.,* 105 Neb. 691, 181 N. W. 706, where compensation was allowed for death resulting from the playful application of an air hose to the deceased's person by a fellow employee, is an example of the first class. It was there said: "If a person familiar with the whole situation could reasonably contemplate that such an accident might result from the peculiar nature and circumstances of the employment, and the nature of the place where the injured man was required to work, then it may reasonably be said to arise out of it."

In the present case, however, we are unable to accept the contention that Hopper's death was due to the fact that he was required to work in a beer parlor. If the beer parlor constituted a special hazard, as it is argued, the assault was not occasioned by that hazard. Hopper was struck, not because of his presence in the beer parlor, but because of his relationship with Denton. It was the culminating incident of their extended fraternizing and drinking together. Denton did not assault a stranger, of whom there were several at the bar, but his comrade of the afternoon, toward whom he did not feel the usual conventional restraints. He had apparently grown tired or resentful of Hopper, or he wanted to display his superiority, for, as he expressed it immediately after the assault, "I thought I would just bloody up his nose for him." The compensation court and the district court were right, therefore, in holding that Hopper's death did not result from a special risk to which his employment had exposed him.

There remains to be considered the contention that Hopper's fraternizing and drinking with Denton were incidents which his employer might reasonably have expected he would do in connection with his work, and that the consequences thereof accordingly arose out of the employment and were part of the industrial risk.

The term "arising out of the employment" in the workmen's compensation law covers all risks of accident from

causative acts done or occurring within the scope or sphere of the employment. All acts reasonably necessary or incident to the performance of the work, including such matters of personal convenience and comfort, not in conflict with specific instructions, as an employee may normally be expected to indulge in, under the conditions of his work, are regarded as being within the scope or sphere of the employment.

The rule applicable to personal ministrations of the workman has been stated by a text-writer as follows: "Acts of ministration by a servant to himself, such as quenching his thirst, relieving his hunger, protecting himself from excessive cold, performance of which while at work are reasonably necessary to his health and comfort, are incidents to his employment and acts of service therein within the workmen's compensation acts, though they are only indirectly conducive to the purpose of the employment. Consequently no break in the employment is caused by the mere fact that the workman is ministering to his personal comforts or necessities, as by warming himself, or seeking shelter, or·by leaving his work to relieve nature, or to procure drink, refreshments, food, or fresh air, or to rest in the shade." 1 Honnold, Workmen's Compensation, p. 381.

The cases of *Moise v. Fruit Dispatch Co., ante,* p. 684, 283 N. W. 495, and *Miller v. Reisch Co.,* 132 Neb. 338, 271 N. W. 853, illustrate this principle. *Goodwin v. Omaha Printing Co.,* 131 Neb. 212, 267 N. W. 419, is an example of another type of incident which was recognized as not constituting such a substantial deviation from the employment as to create an independent hazard.

The test to be applied in such a situation to any act or conduct of an employee which does not constitute a direct performance of his work is whether it is reasonably incident thereto, or whether it is so substantial a deviation as to constitute a break in the employment and to create a formidable independent hazard. The rule necessarily is not capable of formulaic application, and the particular facts of each case must be carefully considered. ·

It may be that, in the circumstances of the present case, as the widow contends, Hopper could reasonably be expected to take a drink of beer as an incident of his employment. Hopper's employer in fact testified that sometimes a service man sampled beer to test its temperature, although the customary way was to look at the thermometer. But even if it were Hopper's privilege to sample beer in testing its temperature, or to take a drink as a reasonable incident of a leisure interval of his employment, that privilege could not be carried to the point of license, so that it, and not the employment, became the dominating factor in his conduct and relationship. The drinking by Hopper of six or seven glasses of beer in a three and a half hour period, the cultivation and continuance of a personal relationship with Denton to the point of Denton's intoxication, and the general sociabilities which were engaged in during the afternoon together created a hazard that went beyond the privileges or reasonable incidents of Hopper's employment. At the time of the assault, he stood at the tavern bar exposed to a formidable independent hazard which he, and not his employment, had created.

His death, as held by the compensation court and the district court, did not arise out of his employment, within the meaning and intendment of the workmen's compensation law.

AFFIRMED.

ROSE, J., dissenting.

The opinion of the majority reflects the care and skill with which the evidence has been reviewed and the law stated, but there seems to me to be a different view of the case, equally plausible and perhaps more in keeping with the purpose and spirit of the workmen's compensation law. It was said in a recent opinion, following earlier decisions:

"It was a purpose of that legislation to shift from employee to modern industry burdens of economic waste or loss arising out of and in the course of his employment as a result of his accidental injury or death and to prevent his

dependents from becoming a public charge." *Moise v. Fruit Dispatch Co., ante,* p. 684, 283 N. W. 495.

A rule of interpretation reads thus:

"It has long been the policy of this state to give a liberal construction of the workmen's compensation law, so that its beneficent purposes might not be thwarted by technical refinement of interpretation." *Maryland Casualty Co. v. Geary,* 123 Neb. 851, 244 N. W. 797.

Of course the death of an employee is not compensable, if it does not arise out of the employment. The question is, did it so arise within the meaning of the workmen's compensation law?

In the present instance defendant was engaged in a great industry—electric refrigeration. The employee was a skilled electrical engineer. He was a man of good character and good habits. He did not designate the place where the duties of his employment called him. He had no choice of location or environment. His employer selected for him the identical room where electrical adjustments were to be made and tested according to standards of the employee's profession. The employee was directed to work in a beer tavern and barroom where beer was sold over a bar by the drink to persons standing about it or seated at tables in front of it. During the entire time required for the performance of the duties of employee, he was mentally and physically alert. While he was awaiting the result of a scientific test in the beer-cooling system in the barroom, a dangerous criminal with aliases and prison records, who had been drinking at intervals in the barroom nearly all afternoon, struck the employee without provocation and killed him. This was the place selected by the employer for the performance of the employee's duties.

It is common knowledge that a barroom is a place of danger frequented by ruthless criminals. When such common knowledge was notorious, the legislature created a department of government to license beer taverns and keep barrooms under surveillance. An employer may anticipate such a danger when he sends an employee into an open barroom to work.

In my opinion an electrical engineer employed for a complete service requiring tests and awaiting results in putting a beer-cooling system in order performs the duties of his employment while thus waiting as well as when using tools in making the adjustments. He was then in the place of employment engaged in his employer's business. He had at the time and place no other task for his employer or himself. He was in the midst of conviviality. Thus surrounded, he did nothing to impair his capacity for service as an employee or to provoke an assault. No duty was neglected. If he was negligent in drinking beer on a summer day with a dangerous criminal whose character was then unknown, such mere negligence did not prevent the allowance of statutory compensation for his death. Where an electrical engineer is assigned to a particular job until finished and is required to make adjustments and await results of tests, the relation of employer and employee does not attach when he begins work on an adjustment and detach while waiting for the result of a test, though, in the interim, he may drink beer which he is cooling by scientific processes.

Refinements and subtle reasoning to show that an employee departs from and resumes his work in a case of this kind seem to me to be more consistent with the rigors of the old common law than with a modern statute simplifying judicial procedure for the benefit of workmen under the compensation law. In my judgment the employment, under such circumstances, is continuous until the work in hand is completed, unless terminated by the employer or by the wilful negligence of the employee or by an independent, self-created hazard. The work in the case at bar had not been completed when employee was killed. He was then awaiting the results of adjustments just made and dismantled appliances had not been replaced. Some of his tools were still in the barroom where he had been working. As I view the whole case, the homicide would not have been committed, except for the place of danger in which the employee was directed by his employer to work. It seems

to me the death of the employee arose out of his employment, within the meaning of the workmen's compensation law. The industry should bear part of the loss. The entire burden shou'd not fall on the dependent widow or on the public.

PAINE, J., dissenting.

With due regard for the opinion of the majority of the members of this court, I respectfully dissent from the opinion which has been adopted.

It is very evident that it is a close case, for many decisions can be cited from other states to support either theory. Hopper was sent by his employer to a tavern in Stuart to repair and adjust a cooling system which was out of order. This work required hours to correctly adjust the system so it would properly cool the beer and produce the proper foam content. He was a skilled workman at his place of employment. He had not completed the job assigned to him. He had made an examination of the cooling system and the guage within a few minutes of the time he was killed. He had not replaced the caps; his tools were ready for use.

All admit that his death occurred in the course of his employment. The only doubt in any one's mind is whether it arose out of his employment. His employer knew just the kind of a place to which he was sending him. There were very few stools in front of the bar. It was perfectly proper for him to occupy one of these stools, and it brought him in close contact with the man who killed him.

I will refer to a very few cases from other courts, which strike me as somewhat in point, and where recovery was allowed.

In *State v. District Court,* 134 Minn. 16, 158 N. W. 713, a bartender was accidentally struck in the right eye by a drinking glass thrown by a patron who was so drunk that he did not know what he was doing. The court here considered the question, did the accident arise out of the bartender's employment, and did such employment in such a place result in the accident? The court answers the questions in the affirmative.

In *Shaw, Ltd., v. Macfarlane,* 52 Scottish Law Rep. 236, a helper in a foundry was struck by an intoxicated stranger and injured, and the court held that he suffered the injury by an accident arising out of, and in the course of, his employment.

In a Texas case, an oil pumper was lured at night from the shack where he was required to sleep, and was shot and robbed. It was held that the heirs could recover. It is said that, if a fireman is playing cards at a fire station and is injured, no one would contend he was not at his employment. *Southern Surety Co. v. Shook* (1931) 44 S. W. (2d) (Tex. Civ. App.) 425.

In *Ivory v. Philpot Construction Co.,* 145 So. (La. App.) 784, a negro was asleep in a tent provided for highway employees, and was injured by a shot from a passing truck at about 10 p. m. A judgment for defendant was reversed, as the injury was held by the court of appeals for Louisiana to "arise out of and in the course of the employment."

In an opinion by Martin, C. J., of the court of appeals for the District of Columbia in 1936, he held that the injury of a cook in a restaurant, when he was suddenly stabbed by a drunk-crazed stranger, arose out of and in the course of his employment. The court said: "It was suffered by the claimant when at his place of duty, when upon the industrial premises of his employer, and while he was engaged at the work for which he was employed." *Hartford Accident & Indemnity Co. v. Hoage,* 85 Fed. (2d) 417. Many cases holding to the contrary can be found in the reports from states where a liberal interpretation is not followed, as in Nebraska.

I now submit a very few decisions from our own court, which should be carefully considered.

In *Ridenour v. Lewis,* 121 Neb. 823, 238 N. W. 745, it was held that, when a radio repair man in passing along the street in Omaha was assaulted by hold-up men, robbed of his own money, and killed, his death arose out of, and in the course of, his employment. Many cases are cited in this opinion, one from the House of Lords, the famous case

of *Dennis v. White & Co.* (1917) A. C. 479, Ann. Cas. 1917E, 325, which says that, where a workman meets with an accident by reason of a risk of the streets to which his employment exposes him, the accident arises out of, as well as in the course of, his employment. See 15 Neb. Law Bulletin, 202.

In *Miller v. Reisch Co.*, 132 Neb. 338, 271 N. W. 853, an employee was sitting at a table and eating dinner. The foreman got up from the table and knocked him down, and this court held that recovery could be had, and that his injuries arose out of his employment.

In *Boyce v. Burleigh,* 112 Neb. 509, 199 N. W. 785, an employee of a chicken hatchery, aged 19, with several other boys, was handling a gun, *contrary to the orders of his employer,* and this court held that there could be a recovery, for while the employee was not engaged in doing any work for the master at the time of the accident, still the accident *arose out of* the employment.

In *Urak v. Morris & Co.*, 107 Neb. 411, 186 N. W. 345, the plaintiff was struck on the hip by a shovel by a fellow workman, the blow being given just for fun, and this court held that the injury occurred during a personal altercation between the two, and that it did not arise out of the performance of any duty or service to the employer. This decision would be authority for denying compensation to the widow in the case at bar if the drunken ex-convict and the deceased had engaged in a quarrel, fight, or altercation, but the evidence does not sustain that conclusion.

In the case of *Goodwin v. Omaha Printing Co.*, 131 Neb. 212, 267 N. W. 419, a traveling man for the Omaha Printing Company, using his own automobile, picked up a "hitchhiker," who shot and killed the traveling man four miles west of Schuyler in robbing him of his car, and in a careful review of many authorities it was held that the duties of the deceased required him to travel, and that highway robbery was a hazard of the highway, and of an employee who was required to travel the highway in the service of his employer. It was claimed in the *Goodwin* case that the de-

ceased, by inviting the "hitchhiker" to ride, brought the injuries upon himself, but the decision rejects this claim, and says that he did not disobey any directions or instructions of his employer in picking up a "hitchhiker." Can it be said in the case at bar that Hopper, by being in the tavern, as required by his employer, or in "jollying" the one who struck him, to keep him good-natured if possible, disobeyed any directions or instructions of his employer? Was he in any way responsible for his own death? Again, in the *Goodwin* case it is said that the traveling man did not step aside from his employment and act for himself on business or pleasure of his own in picking up a "hitchhiker" to visit with him. He was still *within the scope of his employment,* and the accident therefore arose out of and in the course of his employment, and that recovery was proper.

I do not think this court made a mistake in allowing the widow of the slain traveling man to recover for his death under the workmen's compensation law of Nebraska, but the cases are so closely in point that, if the decision is to stand in the case at bar, we should be consistent and set aside the opinion in the case of *Goodwin v. Omaha Printing Co., supra,* for there was no evidence there that the assault was directed against Goodwin because he was an employee, or because of his employment by the Omaha Printing Company.

In the case at bar, Hopper had not completed his work, but was engaged in it at the time he was killed. He was not loitering there for his own entertainment, but was required to be exactly where he was to properly adjust and test out the cooling machine, which it was his business to repair. In my opinion, considering the liberality with which the compensation law should be construed, these former Nebraska opinions are abundant authority upon which to justify a recovery in the case at bar.