WILLIAM WEITZ, APPELLEE, V. G. HOWARD JOHNSON, DOING BUSINESS AS OMAHA MERCHANTS TRANSFER COMPANY, APPELLANT.

9 N. W. (2d) 788

FILED JUNE 4, 1943. No. 31612.

*Rosewater, Mecham, Shackelford & Stoehr,* for appellant.

*Edward F. Fogarty, E. Melvin Kennedy* and *Emmet L. Murphy,* contra.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

MESSMORE, J.

This is an appeal from a workmen's compensation award made by the district court. The plaintiff alleged that he was an employee of the defendant company and received personal injuries as the result of an accident in the course of his employment, and prayed for compensation. The answer was, in effect, a general denial. The trial court found that the injury sustained by plaintiff was "to his upper lumbar and lower thoracic vertebrae, causing and producing

extensive paralysis of his lower limbs, bowels and bladder, and loss of function of nerves and muscles of his body, extending downward from said portion of his vertebrae;" that the plaintiff, upon the happening of said accident, became and for the remainder of his life will remain permanently and totally disabled; that at the time of the accident plaintiff was employed by defendant company at an hourly wage of 55 cents for a regular working day of eight hours; that the employment by defendant was not continuous, within the terms of the workmen's compensation law, and that the plaintiff's wages were such as to entitle him to compensation at the rate of $15 per week for the first 300 weeks from and after April 24, 1941, and at the rate of $10 per week thereafter during his natural life. The judgment further provided for reasonable medical and surgical fees.

Defendant appeals from the award, alleging as error that the findings of fact are not supported by the evidence; that the plaintiff was not, at the time of the accident, working for the defendant; nor was the accident one which arose out of any employment of the plaintiff by defendant.

Plaintiff, a married man 25 years of age, began doing some work for the defendant company from and after April 1, 1941, to the date of the accident. He worked for a period of 16 days during that time at a fixed wage of 55 cents per hour, based on an eight-hour day. He worked at 109 South Tenth street, in Omaha, Nebraska. At this location is a six-story brick building, facing west on Tenth street. There are two entrance doors, both facing west; one about six feet north of the south line of the building, and the other about eight feet north of the first door. Along the south side of the building, running the full length thereof, there is a spur railroad track close to the building. On this track cars are spotted for unloading equipment into the building. There is an elevator shaft approximately 20 to 25 feet east of the west or front end of the building, which is placed against the south wall. There is also a stairway just east of and along side the east wall of the elevator shaft, and there is a steel rolling door through the south wall of the

building, leading to the outside, right at the elevator. The east and west walls of the elevator shaft are of solid brick. At the north side of the elevator shaft there is a wooden sliding gate which is raised and lowered, and which is the only opening into the elevator shaft from the inside of the building. This elevator is a freight elevator, consisting of a platform with cable mechanism. The steel door in the south wall was used for unloading of box cars spotted on the spur track. These cars were generally loaded with cardboard cartons. When gondola cars, being flat freight cars, were unloaded, which was generally at the east part of the building, the supplies would be conveyed through a chute directly into the basement.

Prior to April 1, 1941, this building had been leased by its owners to the United States government for storage of army ordnance supplies. The defendant company had a contract with the United States army authorities under which it was to unload supplies from the freight cars spotted on the spur track and place such supplies in the building. The men to do this unloading were usually obtained by calling Labor Union Hall. Some one in authority in the defendant company would call the hall by telephone. On this occasion, the morning of April 24, 1941, a call came into the hall and was received by an employee, who, in turn, called one of the workmen present. In this connection, when the men were on the job they were often told in the afternoon to report again next morning; otherwise they would report at the Union Hall and wait for calls. Howard Miller, one of the workmen, who had had experience with the defendant in this class of work, answered the call which was from defendant G. Howard Johnson. Miller's version of the telephone conversation is as follows: "A. He (Johnson) asked me if the boys were there. I told him that they were. He said 'All right, you take the gang and go directly down there;' he said 'there is a car there.'" Johnson's version is: "A. I called—I asked for Howard Miller and asked him to get together a certain group of men whom I named." The plaintiff was included in this group, as he had previ-

ously been working for the defendant company. Johnson further testified: "A. After he had notified me that they were there, I told him to take the men and go to the warehouse, 109 South 10th street, and to wait, that we would meet them at the door to get them admitted." The plaintiff, Miller and a workman named Gard proceeded to the warehouse in the plaintiff's automobile. The government had guards stationed at the entrances and at various parts of the warehouse to guard against damage and sabotage. At first the workmen were admitted without identification; later, identification was required.

When the plaintiff arrived at the warehouse he got out of his automobile, went to the front (the west) door, and the guard let the plaintiff and that part of the crew with him inside of the building. The plaintiff walked over to the elevator and raised the gate, as he had done various times before; it was dark, and it looked to him as if the elevator were there. He reached out, started to step across; the elevator was not there, and he fell into the pit from the main floor to slightly below the level of the basement floor.

During the course of plaintiff's employment, he had done various types of work, including piling merchandise in the building, trucking from the car to the place where the merchandise was to be piled, and working in the car outside the building. On the two days immediately preceding the accident, he worked unloading supplies from box cars at the elevator entrance. On the morning in question neither the plaintiff nor the crew knew the work to which they would be assigned. The employee Gard saw the gondola car which was to be unloaded, but plaintiff did not and was not aware what kind of a car had been spotted to be unloaded. To unload the gondola car it would be necessary for some one to raise the wooden gate at the north end of the elevator, so that the trucks could be wheeled onto the elevator platform, to be lowered to the basement. The workmen testified that it was the practice to open the steel rolling door in the south wall of the building at the elevator in order to let additional light and air into the basement.

The testimony of defendant Johnson is that the workmen are instructed to come to the warehouse and remain on the outside until identification of and admission for them could be obtained; that they are not informed as to their work assignments until such time as one in authority for the defendant company reaches the warehouse and gives such instruction; that the workmen are further instructed not to operate the elevator. The record discloses that on other work days during the three-week period that the plaintiff worked for defendant company the men would go on and about their work, regardless of whether any one in authority for the defendant were there in the morning in time; that they had, in fact, become accustomed to going fairly regularly to this class of work, and left their work clothes and work aprons in the building. Just before the accident Miller was getting his work apron; Gard had his work clothes on, preparatory to loading the trucks onto the elevator. The plaintiff was evidently going to open the elevator door to proceed across the platform, assuming that it was level with the floor, to open the door in the south part of the building where he had on the two preceding days unloaded supplies in this part of the building. As he was proceeding to the elevator, the captain of the guard was close behind him, said nothing to him about the elevator, or anything connected with the work, but was present to see what the plaintiff was going to do.

It is well established that in a workmen's compensation case the burden of proof is on the employee, to prove by a preponderance of the evidence that the personal injury was caused to the employee by an accident, arising out of and in the course of his employment, and citation of authority is not necessary.

In the instant case it was the custom to open the steel door in the south wall of the building, to let in light and air. This was true, whether the workmen were unloading box or gondola cars, and frequently cars of both types would be unloaded on the same day. Plaintiff opened the wooden gate at the north end of the elevator. It was necessary to

raise this gate for the workman Gard, who was preparing to bring over hand trucks to be wheeled onto the elevator platform and lowered to the basement floor, and enable the workmen to unload the gondola car. Plaintiff had arrived, was admitted to the premises, was inside the building, where his duties were to be performed and required his presence, and had gone about his work.

The term, "arising out of and in the course of employment," contained in the workmen's compensation law, covers all risks of accident from causative acts done or occurring within the scope or sphere of the employment, which include all acts incident or necessary to the performance of the work. *Hopper v. Koenigstein*, 135 Neb. 837, 284 N. W. 346. See, also, *Coster v. Thompson Hotel Co.*, 102 Neb. 585, 168 N. W. 191; *Tragas v. Cudahy Packing Co.*, 110 Neb. 329, 193 N. W. 742; *Speas v. Boone County*, 119 Neb. 58, 227 N. W. 87; *Sentor v. City of Lincoln*, 124 Neb. 403, 246 N. W. 924; *Struve v. City of Fremont*, 125 Neb. 463, 250 N. W. 663.

We conclude that the plaintiff sustained personal injuries as the result of an accident arising out of and in the course of his employment.

It is next contended that the employment of the plaintiff was continuous employment, within the meaning of the compensation law of this state. It is not disputed that the plaintiff was paid 55 cents per hour for his work, based on an eight-hour day. The compensation law provides in part:

"Wherever in this article the term 'wages' is used, it shall be construed to mean the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the accident. * * * In continuous employments, if immediately prior to the accident the rate of wages was fixed by the day or hour or by the output of the employee, his weekly wages shall be taken to be his average weekly income for the period of time ordinarily constituting his week's work, and using as the basis of calculation his earnings during as much of the preceding six months as he worked for the same employer; the calcu-

lation, furthermore, to be made with reference to average earnings for a working day of ordinary length and exclusive of earnings from overtime." Comp. St. 1929, sec. 48-126.

The record in this case shows that plaintiff was employed from April 1 to the date of the accident, April 24, for some 16 days. This is not continuous employment and was not intended to be. It was not seasonable, where employment depended upon the weather, as defined in the section of the statute. This being true, the case is governed by the first sentence in section 48-126, *supra,* providing that the term "wages" as therein used "shall be construed to mean the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the accident." See *Carlson v. Condon-Kiewit Co.,* 135 Neb. 587, 283 N. W. 220. We conclude that the court properly fixed and determined the compensation to be paid plaintiff.

Section 48-125, Comp. St. Supp. 1941, provides in part: "Whenever the employer refuses payment, or when the employer neglects to pay compensation for thirty days after injury, and proceedings are held before the Compensation Court, a reasonable attorney's fee shall be allowed the employee by the court. In the event the employer appeals to the district court from the award of the Compensation Court or any judge thereof and fails to obtain any reduction in the amount of such award, the district court may allow the employee a reasonable attorney's fee to be taxed as costs against the employer." It will be observed that the district court, under the conditions specified in the statute, may allow an attorney's fee.

We see no reason why an allowance should not have been made by the district court for attorney's fees. The injuries received by the plaintiff were most serious and resulted in total permanent disability to him for the balance of his natural life. The attorney's fees allowed for services in this court are fixed in the sum of $350 to be taxed as costs against the defendant.

AFFIRMED.